L. A. THURSTON *et al.*, Executors of Estate J. N. Robinson, *vs.* S. C. ALLEN *et al.*, Executors and Heirs of James Robinson.

SUBMISSION OF CONTROVERSY, UNDER SECTION 1140, CIVIL CODE.

HEARING, DECEMBER 28, 1891. DECISION, FEBRUARY 17, 1892.

JUDD, C.J., McCULLY, BICKERTON, DOLE, JJ.

The testator devised land to his sons M. and J. for the term of their natural lives, to share and share alike, and after the decease of M. one half to his heirs, and after the decease of J. one half to his heirs.

Held, M. and J. are tenants in common for life.

By the *Rule in Shelley's Case*, M. and J. would have the whole estate absolutely. But the Rule in Shelley's Case, by virtue of its being a part of the Common Law of England, is not in force in this kingdom, the Common Law as such not being in force here. Though free to adopt the rule, the Court declines to adopt it as the law of this kingdom.

The intention of the testator should govern in the construction of wills. The intention of the testator was to give only a life estate to M. and

J. This would be defeated by the operation of the Rule in Shelley's Case.

The "heirs" of J. are whoever are entitled to his property by the statute of descent, if he had died seized of this property and intestate. J. died leaving a widow but no issue nor father nor mother ;

Held, that his "heirs" are his widow as to one half, and his brother and sisters as to the other half.

A devise of real and personal property to executors in trust, "the income from the same to be paid to J. N. R. for the term of his natural life, and after his death I give, devise and bequeath the said one-eighth to his heirs," creates a valid trust, and J. N. R. has the income for life and at his death the eighth goes to his statutory heirs, who in this case are his widow, as to one half, and his brother and sisters as to the other half.

A widow is an "heir" by our statute of descent.

## SUBMISSION.

The undersigned, Lorrin A. Thurston and Caroline J. Robinson, Executors of the Will of J. N. Robinson, deceased, and Caroline J. Robinson, Mark P. Robinson, Mary E. Foster, Victoria Ward, Bathsheba M. Allen and Samuel C. Allen, her husband, Matilda Foster and W. E. Foster, her husband, Annie Jaeger and Albert Jaeger, her husband, Lucy McWayne and Albert McWayne, her husband, and S. C. Allen and M. P. Robinson, Executors of the Will of James Robinson, deceased, respectfully represent that they are parties to a question in difference which might be the subject of a civil action in the Supreme Court, which they have agreed to submit to the Justices of the Supreme Court without suit.

That the facts out of which said controversy arises are as follows:

James Robinson, late of said Honolulu, deceased, by his last will and testament, duly admitted to probate, a copy of which is hereto annexed and made a part hereof, made certain bequests and devises of property within the jurisdiction of this Court to his son John N. Robinson.

Said John N. Robinson died childless on the 25th day of March, 1890, leaving a will which has been duly admitted to pro-

bate, by which he devised all of his estate to his widow, Caroline J. Robinson, above named.

Rebecca Robinson, widow of the said James Robinson, died before the said John N. Robinson.

The plaintiffs are the Executors of the Will of said John N. Robinson, and his widow.

The defendants are the brother and sisters of said John N. Robinson, and the husbands of said sisters respectively, and the trustees under the will of said James Robinson.

The questions in issue are :

1. What estate did John N. Robinson take under the first, fourth and seventh paragraphs of the will of said James Robinson?

2. To what estate is the said Caroline J. Robinson now entitled therein?

———

Following are the First, Fourth and Seventh paragraphs of the Will of James Robinson, the subject of this controversy :

*First.* I give, devise and bequeath to my wife, Rebecca Robinson, for the term of her natural life, the house and premises in Nuuanu valley, being my present place of residence ; also the land of Pakaukai near the Nuuanu valley stream ; also the land on the opposite side of the road from my present place of residence in Nuuanu valley ; also the fish pond premises near the corner of Liliha street and the Ewa road, Honolulu ; the whole of the said described property to be held and enjoyed by my said wife for the term of her natural life, or so long as she shall remain unmarried and my widow, and in the event of her marriage or death, I give, devise and bequeath the whole of the above described property to my sons, Mark Robinson and John N. Robinson for the term of their natural lives, to share and share alike, and after the decease of Mark Robinson, I give, devise and bequeath one half of the said property to his heirs, and after the decease of John N. Robinson, I give, devise and bequeath one half of said property to his heirs ; and it is my will that the tomb on the premises aforesaid shall remain there as a burial place for myself and my family, and shall never be dis-

turbed. I also give, devise and bequeath to my said wife, Rebecca Robinson, all the furniture and household effects in my present place of residence in Nuuanu valley, and the sum of twelve hundred dollars a year for the term of her natural life, the same to be paid to her by my executors hereinafter named in quarterly payments of three hundred dollars, the foregoing provisions to be accepted by my said wife in lieu of dower.

*Fourth.* I give, devise and bequeath to my sons, Mark Robinson and John N. Robinson, to share and share alike, for the term of their natural lives, all the Pakaka or Point premises situated in Honolulu, and all improvements and appurtenances to the same belonging, the stone building and premises at the corner of King and Nuuanu streets, Honolulu, and the land of Hoaeae, Ewa, Island of Oahu, and all tracts of land in Ewa in which I have an interest ; and after the decease of Mark Robinson, I give, devise and bequeath one half of the said property to the heirs of Mark Robinson ; and after the death of John Newcomb Robinson, I give, devise and bequeath one half of the said property to John N. Robinson's heirs at law. I also give, devise and bequeath to Mark Robinson and John N. Robinson, to share and share alike, all the cattle, horses and sheep, and all other personal property to the land in Ewa aforesaid belonging or appertaining.

*Seventh.* One-eighth of the rest and residue of my property, both real and personal, I give, devise and bequeath to my executors hereinafter named in trust, the income from the same to be paid in quarterly payments (here the children other than John N. Robinson are devised one-eighth each). One eighth to my executors hereinafter named in trust, the income from the same to be paid in quarterly payments to my son John N. Robinson for the term of his natural life, and after his death I give, devise and bequeath the said one-eighth to his heirs.

OPINION OF THE COURT, BY JUDD, C.J.

We shall first discuss the first and fourth paragraphs of the will in question, and much of the reasoning on these paragraphs will apply to the seventh paragraph. Eliminating therefrom

what is unessential to be discussed here, the devises of the land (after the life estate of the testator's ·widow in the land in the first paragraph) are to Mark P. Robinson and John N. Robinson for the term of their natural lives, to share and share alike, and after the decease of Mark one-half to his heirs, and after the decease of John one-half to his heirs. Condensed still further the question is, what is the estate of John in the property, the devise being to him for life as tenant in common with Mark, remainder of the moiety to his heirs? We use the expression "as tenant in common" advisedly. The contention by Ashford & Ashford, for the defendants, that the words of paragraphs first and fourth create a joint tenancy in the testator's two sons. Mark and John, with the right of survivorship, is without foundation. The distinguishing feature of joint tenancy is that each has the whole and every part; "each holds *per my et per tout*; each is the holder of the whole." The definition quoted by counsel from Greenleaf's Cruise, p. 364, "Where lands are granted to two or more persons to hold for them and their heirs * * *without any restrictive, exclusive or explanatory words*, all the persons named in such instrument take a joint estate," destroys the position taken. The words in the devise, that Mark and John are "to share and share alike," show conclusively that each is to have and enjoy a half, which would make them tenants in common, and that each is *not* to be holder of the whole. Moreover, the limitation in the devise of the share of each in the estate *to the heirs* of Mark and John after their decease, respectively, is on its face repugnant to the vesting of the estate in the survivor, be it Mark or John. See *Perry vs. Woods*, 3 Ves. Jr., 204.

We adhere to the doctrine laid down in *Awa vs. Horner*, 5 Hawn., 543, that it would be unwise to adopt the principle of joint tenancy, where a conveyance is made to two or more persons without indicating how the same shall be held. Such estates we consider to be tenancies in common, unless expressly declared to be joint tenancies by the instrument creating them.

The plaintiffs contend that the Rule in Shelley's Case is in force in this kingdom, or if not in force it should be recognized

and adopted in this case, and that according to it the several devises in the various paragraphs of the will in question, they being devises to John N. Robinson for life, remainder to his heirs, created an estate in fee simple in John so that it was alienable by him during his life and devisable by him by his will. It was admitted and there is no doubt that by the Rule in Shelley's Case, if it is law in this kingdom, the devises in paragraphs first and fourth would confer such an estate upon John, passing by for the present the question whether paragraph seven is within the rule. The rule may be stated thus: where the devise of a freehold is limited to A for life, and by the same devise or conveyance the remainder is limited to "A's heirs," A has a single estate of inheritance in the property. The word "heirs" is a word of limitation of A's, the first taker's, estate; and *heirs* under such a devise or conveyance would have no greater right than the heirs of any grantee in fee where the estate is conveyed directly to the grantee and his heirs. That is, the heirs of A take by "descent" from A, and not as "purchasers" under the grantor or devisor of A. Jarman defines the rule thus, "Where an estate of freehold is limited to a person, and the same instrument contains a limitation, either mediate or immediate, to his heirs or the heirs of his body, the word *heirs* is a word of limitation, *i.e.*, the ancestor takes the whole estate comprised in this term."

In the case before us James Robinson, by paragraghs 1 and 4 of his will, devised certain estates to John for life, and after his death to his heirs. By the rule under discussion John took an estate of inheritance in fee simple in the land upon the death of his father, with the unrestricted right of disposition. This is a rule of law and not of construction, and in all jurisdictions where the common law is in force, unrepealed by statute, estates within the rule are controlled by it. This rule takes its name from an early case reported in 1 Coke's Reports, 93, in the 23d of Elizabeth, about A. D. 1580, as *Shelley's*, though it was then an ancient dogma of common law.

The fundamental question for us to decide is, first, whether this rule is in force in this kingdom and, secondly, whether we shall

adopt it as the law of this case and of this kingdom. We are obliged to answer that it is not, by virtue of its being a part of the Common Law, the law in this kingdom. This Court has held on repeated occasions that the common law is not in force in this kingdom. As was said by Mr. Justice McCully in *The King vs. Robertson*, 6 Hawn., 725, "this is not an English colony which brought out the law of England to be in force here, except as modified by express statute." As early as 1852 Judge Robertson said, in speaking of the common law of England by which a widow is not dowable in leasehold estates;—"but this doctrine of the common law *has not* been adopted in this kingdom." *In the Matter of Vida*, 1 Hawn., 108. The case of *Kake vs. Horton*, 2 Hawn., 211 (1860), was an action by a widow to recover damages for the death of her husband by the wrongful act of defendant. This Court then said, "It is urged by counsel for defendant that the common law of England is in force in this kingdom and that therefore the action cannot be maintained in this Court. In our opinion this argument is not sound. We do not regard the common law of England as being in force here *eo nomine* and as a whole. Its principles and provisions are in force so far as they have been expressly or by necessary implication incorporated into our laws by enactment of the Legislature, or have been adopted by the rulings of the courts of record, or have become a part of the common law of this kingdom by universal usage, but no further," See also Opinion of Judd, C. J., *In Re Congdon*, 6 Hawn., 635; also of Hartwell J., *In Re Apuna, id.* 732 ; and *Awa vs. Horner*, 5 Hawn., 543.

This Court is authorized to adopt the reasonings and principles of the common law "so far as the same may be founded in justice and not in conflict with the laws and customs of this kingdom," Section 823 of Civil Code; and "Resort may be had to the laws and usages of other countries," Section 14 *id.*

We and our predecessors on this bench have felt free to examine into the reasoning of every principle of the common law as it has been presented to us for adoption from time to time. We were much impressed with the statement made at the argument by Mr. Peterson, of counsel for the plaintiffs, that

of the nine hundred reported cases of this Court, in only about nine cases, or one per cent., has this Court departed from the common law on the point under consideration. When we have followed and adopted the common law, we have felt that its reasoning was sound and just, and its principles adapted to our circumstances. When we have felt otherwise we have not hesitated to reject it. And although it may now be asserted with considerable assurance, in view of the past history of this Court, that when a question arises new to the Courts of this Kingdom, we will *probably* follow the precedents and principles laid down by the Courts of those countries where the common law prevails, we are not *bound* to follow them. They are not absolutely authoritative, and until further restrained by statute, we shall continue to rejoice in our freedom. It was urged upon us that we should now adopt the Rule in Shelley's Case, because a number of titles had been passed and vested in this country, under competent legal advice, according to this rule. We are not aware judicially that this is the fact, and isolated instances of hardship where the rule has been followed would not compel us to adopt it, if in our judgment its general effect would be pernicious.

Having declared that this Court is free to adopt the Rule in Shelley's Case, or to reject it, we now discuss the considerations which should control our judgment. In the first place, if the theory which gave it birth was in order that the "lord might not be deprived of his wardship by allowing the heir to take as purchaser instead of by descent," (2 Wash. R. P., 269) or whether because of the aversion of the common law to an inheritance being in abeyance, we answer that these reasons are inapplicable to our circumstances. There is more force in the argument that it should be adopted because it favors the free alienation of land. But it became law in England when the right of alienation of land was not favored by the lords of the landed estates.

If it is such a wholesome rule and so important to establish in this Kingdom, why have some twenty-three States of the American Union, where it was a part of their fundamental law from its colonial period, or adopted by its early statutes or con-

stitutions, repealed it either wholly or as to wills? We confess that the abolition of this rule by the majority of States whose circumstances are not unlike our own has great weight with us. And the considerations which have led those States to take this position, one after another, after having watched its operations and being convinced of its unwisdom, are powerful.

The most cogent reason advanced against the adoption of the rule, is that it defeats the intention of the testator in many cases. That it would defeat the intention of James Robinson, as expressed by his will, is clear. He has expressly made known by his will that his wish was that his sons should enjoy the use of his landed property only during their lives, and that after their death it should go to their heirs. He had reasons for this sufficiently strong in his own mind. He wished to keep this property intact during the lifetime of his sons, or until one should die. That this wish has been accomplished by reason of the fact that this question was not raised until the death of one of them, has no force as an argument.

The application of the Rule in Shelley's Case to this will would undoubtedly defeat the testator's intention. Ch. Kent says that though this rule has been firmly established as an axiom of the English law of real property for near 500 years, it is admitted to interfere, in most cases, with the presumed, and in many others with the declared intention of the parties to the instrument to which it is applied. 4 Kent Com., 218*. Note 1 to Section 332 of Jarman on Wills, by Bigelow, says that the tendency of the American cases in such States (where the rule in Shelley's Case is in force) "is strongly in the direction of giving effect to the intention of the testator, whenever there is indication, however indirect, of a knowledge of the existence of the rule, and of a purpose to escape its consequences, provided the language of the will is sufficient for that purpose," citing *Lytle vs. Beveredge*, 58 N. Y., 600; *Huber's Appeal*, 80 Penn. St., 348, etc.

Chancellor Kent says in 4 Kent's Com. 534*, of the Constructions of Wills: "The intention of the testator is the first and great object of inquiry, and to this object technical rules are,

to a certain extent, made subservient. The intention of the testator, to be collected from the whole will, is to govern, provided it be not unlawful, or inconsistent with the rules of law." In the construction of devises, the intention of the testator is admitted to be the pole star by which the courts must steer, *id.* 537.* And we find that it was the intention of the testator in paragraphs 1 and 4 of his will that his sons Mark and John should have only life interests in the lands.

The plaintiff's counsel claims that the Court has recognized the existence of the Rule in Shelley's Case in a decision reported in 6 Hawn., 692—*Chillingworth vs. Lindsey.* This decision was by the late Justice Preston and did not go to the Full Court. But here the Judge held that the facts took the case out of the rule and he did not discuss the question whether the rule was in existence or not, for it was unnecessary to do so for it was not the issue before the Court.

Another position by the plaintiffs is that as the words used in the royal patents granting lands in this Kingdom are to "A and his heirs and assigns," the Government and the country have recognized and acted upon the rule in Shelley's Case.

It is undoubtedly true that by the common law of England the use of the word "heirs" was necessary in a grant in order to create an estate in fee or an estate of inheritance. "If the gift was to one without any words of limitation, it was only for such a term of time as he could personally hold it, namely, for his own life. But if given to one and his heirs, it was understood to pass in succession after his death, without being subject to his control by any act done by him, to his descendants who were recognized by the feudal law as his *heirs.*" 1 Wash. R. P., 28. Now, although the adoption of the principle, that the word "heirs" is a word of "limitation" and not of "purchase," undoubtedly led up to the adoption of the rule in Shelley's Case, yet it is not correct to say that the adoption by us of the principle, that a grant or devise " to A and his heirs" creates an estate in fee in A, would make it necessary to adopt the rule in Shelley's Case and thus destroy an estate carved out for life in A, because

after his death it was devised to his " heirs," for thus the testator's intention would be defeated.

It was clearly the intention of the King and Government in the use of the word "heirs" in royal patents to give an estate in fee simple to the patentee, and it was introduced to define the character of the estate in the patentee. This is supported by 2 Redfield on Wills, 341. But it does not become necessary in this case to discuss the question whether an estate in fee can be created by grant or devise without the use of the word *"heirs."*

As regards the seventh paragraph of the will, or the trust clause, we have listened to the able and exhaustive arguments by counsel for the plaintiffs and for defendants on the question whether the devise in this paragraph is within the rule in Shelley's Case. It was admitted by counsel on both sides, and it is undoubtedly law, that both estates, the freehold and the remainder, should be legal or both be equitable or the rule will not apply. Counsel for plaintiffs contend that the trust created in the executors by this will is an active, private, executed trust, and therefore a legal estate. But, having come to the conclusion that the rule in Shelley's Case is not to be applied to any of the devises or bequests in any of the paragraphs of this will, we deem it unnecessary to encumber this opinion with the discussion of the question whether both estates are legal, or whether the estate of the executors (trustees) is equitable and that of the heirs of John legal.

A valid trust was created by the seventh paragraph of the will, and must continue so long as any of the eight mentioned children of James Robinson survive. We therefore answer the first question of the submission, as follows: John N. Robinson took, under the first, fourth and seventh paragraphs of the Will of James Robinson, an estate for life.

The remaining question is, "To what estate is the said Caroline J. Robinson entitled?" She is the widow of John N. Robinson, who died without issue. The fact that John devised *all* his estate to Caroline, his widow, is of no special importance so far as the property left by the will of his father is concerned, for, as his interest in it was for his life only, he could not de-

vise it, and he was practically "intestate" as to this property. By the first paragraph of the will of James Robinson, one-half (undivided) of the lands therein described go now, John being dead, to "his (John's) *heirs.*" By the fourth paragraph, one-half (undivided) of the land described therein goes now, John being dead, to "*John N. Robinson's heirs at law.*" We see no difference in this case between the words "heirs" and "heirs at law," though the case for the plaintiffs is perhaps strengthened by the use of the latter term. The testator has used these terms interchangeably.

By the seventh paragraph, one-eighth of all the rest and residue of the property, both real and personal, goes now to the "heirs" of John N. Robinson. The exact words of the paragraph are, "one-eighth to my executors, hereinafter named, in trust, the income from the same to be paid in quarterly payments to my son, John N. Robinson, for the term of his natural life, and after his death I give, devise and bequeath the said one-eighth to his heirs." It is not one-eighth of the *income* that is devised to John's heirs, but one-eighth of the *corpus* of the estate.

Who are the heirs of John N. Robinson? If he had died intestate, by our statute of descent his widow (he dying without issue, and his father and mother both being dead,) would be entitled to one half of his property, both real and personal, an d his brothers and sisters to the other half. Civil Code, Section 1448. That a *widow* is a statutory "heir" of a deceased intestate is clear by Section 1447 of the Civil Code, which reads that the property, both real and personal, of a person dying intestate within this Kingdom shall descend to and be divided among his heirs, as hereinafter described. * * * "If he shall leave no issue, nor father nor mother, his estate shall descend, one half to his widow, and the other half to his brothers and sisters, and to the children of any deceased brother or sister, by right of representation."

It is unnecessary to discuss many of the cases cited, which declare that a widow is not an heir. She is recognized as one by our statute. She is even considered one of the kindred. "If

the intestate shall have been married, and leave no kindred but a widow, then she shall inherit all his estate." Latter part of Section 1448, Civil Code.

It is claimed that the strict, technical meaning of the word "*heir*" is what James Robinson intended, that is, heirs of the blood of the ancestor. We find nothing in the will to indicate this. The Statute of Descent, quoted from above, was in force at the time James Robinson made his will. We must presume that he meant by "heirs" those who, by the Statute of Descent, would take the property. It would have been easy for him to have limited the word "heir" to those of his blood—but he did not.

In this Kingdom *real* as well as *personal* estate of an intestate descends together by the same statute to a person's heirs, there being no distinction between the descent of realty and personalty. We must bear this in mind, for many of the cases cited are from states where the "heirs" take real estate but the personal estate is distributed to the "*next of kin*," according to the Statute of Distribution.

In *Tillman vs. Davis*, 95 N. Y., 17, the Court say: "The primary meaning in the law of the word 'heirs' is the persons related to one by blood, who would take his real estate if he died intestate. The proper primary signification of the words 'next of kin' is those related by blood who take the personal estate of one who dies intestate." The decisions in New York State are to the effect that a widow is neither an "heir" or "next of kin" to her husband. It is held in England that by the words "heirs of her late brother, J. S.," was meant the next of kin of J. S., according to the Statute of Distributions, together with the widow of J. S., if living at testatrix's death." *In re Steevens' Trusts*, 15 Eq. Cases, L. R., 110. In the following cases the word "heirs," when applied to personal property, means "those that by the Statute of Distributions take the personal property in case of intestacy, and hence embraces widows." *Eby's Appeal*, 84 Penn. St., 241; *Sweet vs. Dutton*, 109 Mass., 589; *Welsh vs. Crater*, 32 N. J. Eq., 177; *Collier vs. Collier*, 3 Ohio St., 369.

*Lavery vs. Egan*, 143 Mass., 392, bears a close analogy to the

one at bar. A testator by his will gave to his four grandchildren certain estate during their lives in equal shares, "and when they shall respectively decease, to their respective *heirs*, executors, administrators and assigns." One of the grandchildren, Susan, died intestate, leaving a husband. Held, that under the Statute of 1880, (Pub. St., 124, § 1) her husband took her one-fourth interest. The Court say that by the statute "the husband or wife takes an estate in fee precisely as an heir takes, and we think *they are to be considered as statutory heirs.*" "Although, in the case at bar, the heirs of Susan do not take from her by inheritance, but take as persons designated by the will, we know of no way of determining the persons intended by the will except by ascertaining the persons who by law would have inherited the estate from her (Susan) if she had died seized of it and intestate."

We adopt this reasoning. We know of no way of ascertaining who James Robinson intended by the "heirs of John," except by ascertaining who would inherit John's estate, if he had died seized of it and intestate. This same construction was put by Judge Cooley on the word "heirs," in *Hascall vs. Cox*, 49 Mich., 435.

We therefore answer the last question in the submission as follows: Caroline J. Robinson is now entitled to one quarter of the lands mentioned in the first and fourth paragraphs of the Will of James Robinson, that is, one half of John's half, and to one half of the eighth, that is, one sixteenth of the estate mentioned and described in the seventh paragraph of the said will, as devised to John.

Costs divided.

*Thurston & Frear, C. L. Carter* and *A. P. Peterson*, for plaintiffs.

*A. S. Hartwell, F. M. Hatch* and *Ashford & Ashford*, for defendants.