KAMAKA KEKAUOHA *v.* SCHOONER ROBERT LEW-
ERS COMPANY, sole owner of the American Schooner,
Robert Lewers.

## DECIDED: MARCH 27, 1901.

1.  In the presence of great and unforeseen danger, no man is ex-
    'pected to act with deliberation.
2.  Negligence need not be intentional; inattention may be, and often
    is, the strongest evidence of negligence.
3.  Ordinary care has relation to the situation of the parties and the
    business in which they are engaged, and varies according to the
    exigencies which require vigilance and attention.
4.  The degree of care to be used is proportioned to the danger to be
    apprehended of inflicting an injury upon others.
5.  Under the Hawaiian Statute (Section 1109. Ballou's Compiled
    Civil Laws of Hawaii, 1897), providing that the "common law of
    England, as ascertained by English and American decisions, is
    hereby declared to be the common law of the Hawaiian Islands
    in all cases except as otherwise expressly provided by the Ha-
    waiian Constitution or laws, or fixed by Hawaiian judicial prece-
    dent, or established by Hawaiian usage," and, as decided by the
    Supreme Court of Hawaii in 1846 in the case of Kake v. Horton
    (2 Haw. 211), the common law rule that an action would not lie
    for damages for the wrongful killing of a human being is rejected,
    and "damages in this class of cases may be assessed on the prin-
    ciple of compensation or reparation."
6.  Under Section 1109 of the Compiled Civil Laws of Hawaii of 1897,
    and the decisions of the Supreme Court of the Territory of Ha-
    waii, jurisdiction in admiralty sustained in an action *in
    personam* instituted by a widow to recover damages for the wrong-
    ful killing of her husband, a drayman, by reason of the breaking
    of a chain used in lowering a bed plate weighing some 25,000
    pounds from the schooner Robert Lewers, owned by the libellee,
    where it was shown that the officers and men of the schooner had
    entire charge and control of the appliances used in the lowering
    of the said bed plate, and negligence was proven.
7.  The husband of libellant, a drayman, while assisting in the un-
    loading of a heavy bed plate weighing some 25,000 pounds from
    the schooner Robert Lewers, owned by the libellee, was killed.
    While the bed plate was being unloaded from the vessel, and was
    suspended in the air by means of a block and tackle under the
    exclusive control of the officers and men of the schooner, a small
    iron chain broke, which caused the bed plate to swing round to

the side of the vessel, up which the libellant's husband was endeavoring to climb in order to avoid the swinging plate, when it caught and killed him. *Held,* that his death was due to the breaking of the small iron chain, and was the result of the negligence of the officers and men of the vessel.

8. Where a five-eighths of an inch chain broke in lowering a piece of casting weighing 25,000 pounds, and no explanation is offered for the breaking of the chain, and it is in testimony that it is more dangerous to use a chain than a rope in this class of cases, *Held,* that it was the duty of the officers and men of the schooner, under the circumstances of this case, to have used the very best and strongest appliances known to the business, and it was negligence to have used any doubtful or uncertain appliances or any rope or chain of doubtful strength.

9. The unexplained breaking of the chain in this case is one of the proofs of negligence.

IN ADMIRALTY.    ACTION FOR DAMAGES FOR DEATH OF HUSBAND.

*T. McCants Stewart,* attorney for libellant.
*W. O. Smith* and *A. Lewis, Jr.,* attorneys for libellee.

ESTEE, J.    The libellant is Kamaka Kekauoha, the widow of Enoch Kekauoha, deceased.

The libellee is a corporation and is the owner of the American schooner "Robert Lewers."

It appears that Enoch Kekauoha, was killed on the 24th day of July, 1900, at Honolulu, by being struck with a large iron bed plate, weighing 25,000 pounds, which was being unloaded from the said schooner, and which swung against him as he was seeking a position of safety by climbing up the side of the said schooner Robert Lewers.

It further appears that deceased was one of four draymen working for Hustace & Co., of Honolulu; and that they were on the wharf to which the said vessel was tied, to load and haul away the said bed plate which had been shipped as freight on that vessel, from San Francisco to Honolulu. The Captain of the Robert Lewers and the other officers and men were engaged in removing the said bed plate from the vessel to the truck on the wharf. This was being done by ropes and blocks attached to the main and mizzen masts of the vessel with a guy line fast to

a boiler lying on the wharf; and the officers and men on the vessel had the exclusive control of the handling of the same. All the lashings and lines so employed were rope, except a short chain said to be fifteen feet in length, which broke and then the casting swung around to the side of the ship and killed the husband of the plaintiff. He, being on the inside of the swinging plate, ran to get on the deck of the vessel to avoid it, but was caught and killed before reaching there.

This action is brought by the wife of the deceased, alleging that her husband was killed by the negligence of the officers and men on the vessel.

The accident occurred within the admiralty jurisdiction of this court. The next inquiry is, will an action lie in a court of admiralty for the unlawful killing of a human being?

The English common law did not permit such actions, but in 1846, the English Parliament passed an Act known as Lord Campbell's Law, which practically repealed the old common law rule in such cases provided. The Hawaiian Islands had never fully adopted the English common law as their law. *Thurston v. Allen*, 8 Haw. 392; the *King v. Robertson*, 6 Haw. 718, 725; *Kake v. Horton*, 2 Haw. 209, 222; *Awa v. Horner*, 5 Haw. 543.

On this point, the case of *Kake v. Horton* is especially in point, where the Supreme Court of this territory laid down the broad and enlightened rule "that damages in this class of cases may be assessed on the principle of compensation or reparation." That is now the law of the territory.

The Court further said in that case, "we are not fettered by the English common law; no legislative enactment is required to remove that obstacle to the maintenance of an action like the present one in an Hawaiian court, and we think it ought to be permitted as being consonant with rational law and reason."

Sections 1215, 1232 and 1234 of the Civil Laws of Hawaii, which are referred to by counsel for libellants, merely point out how actions like the one at bar can be brought. The statute

assumes that the right of action exists, but it seems that it nowhere in words declares that it does exist. But, as the Supreme Court of the Territory has held that it did exist, and in common right the unlawful killing of a human being should give to the surviving widow an action against the guilty party, this Court will be largely controlled in this matter by that opinion.

. It also seems to be the settled law that in damage suits like the one before us, an action may be brought in the Territory for damages *in personam* in admiralty for the unlawful killing of a human being. And more particularly since the Supreme Court of the Territory has decided the case of *Kake v. Horton*, 2 Haw. 211, which is on all fours with the one under consideration.

I note among the authorities referred to by counsel for libellee, that of *Insurance Co. v. Brame*, 95 U. S. 754. This is not in point, because that was an action brought by a life insurance company on account of the unlawful killing of a person insured by it, and not an heir or relative. It finally did hold, however, that "no action lay for the killing" which is not the law of this territory.

The next case referred to is *The Harrisburg*, 119 U. S. 199. This was an action *in rem*. In that case the Court decided what is not now contradicted, namely: that at common law no civil action lies for an injury which results in death. But today, as we have seen, there is no common law of England remaining on this subject. The common law was abrogated by Lord Campbell's Act in 1846; and in any event this territory only adopted the common law when not in conflict with the decisions of its courts. See 1109 Civil Laws. The English common law was not the source of our system of laws in these islands.

Even on the mainland, there has been a wide divergence of opinion on this subject. For instance, in *Cutting v. Seabury*, 1 Sprague 522, it is held that "the weight of authority in the

common law courts seem to be against this action but natural equity and the general principles of law are in favor of it."

And as we are making new rules for this territory, we had better commence right by holding that the Courts have jurisdiction in this class of cases, for in this territory we are not bound by the old common law rule. It is to be hoped we will follow, in this class of cases, a higher plane of equity and justice. Mr. Chief Justice Chase said in the *Sea Gull,* Fed. case, No. 12,578, that:—

"It better becomes the humane and liberal character of proceedings in admiralty, to give than to withhold the remedy, when not required to withhold it by established and 'inflexible rules.' "

The eminent Chief Justice then referred to several states which had followed the common law rule, but adds, that "in other states the English precedent has not been followed."

So it was held in the *Clatsop Chief,* 8 Fed. Rep. 163, Judge Deady, that "it has been seriously doubted whether the rule of the common law that a cause of action for an injury to the person dies with the person is also the rule of the maritime law. There is some authority for the proposition that it does not, and that in admiralty a suit for damages in such a case survives." And authorities there cited.

The learned Judge there adds, "I see no valid reason why . . . . . . . . the admiralty courts in the exercise of their jurisdiction *in personam* over maritime torts, should not recognize and enforce the right so given."

See also the opinion of Judge Brown in the case of *The Garland,* 5 Fed. Rep. 924, where he says the common law rule is not consonant with either "reason or justice;" and concurs with the views expressed by Judge Deady in the case of *Holmes v. O. & C. Ry. Co.,* 5 Fed. Rep. 75.

It was also held in *The E. B. Ward, Jr.,* 17 Fed. Rep. 456, "that now the admiralty courts are permitted to estimate the damages which a particular person has sustained by the wrongful killing of another, and enforce an adequate remedy."

See also *The Columbia*, 27 Fed. Rep. 704, where Judge Brown said: "I hold in this case as seems to me most consonant with natural justice and equity, that the admiralty court has jurisdiction."

It seems that the most enlightened jurists of modern times hold that actions of this sort brought *in personam*, should be sustained upon "the principle of natural equity and common right," and since 1846 that has been the law of England.

Indeed it requires but a limited amount of state or territorial authority to authorize the bringing and maintaining of an action in admiralty *in personam* for the unlawful killing of a human being, because that is a natural right. Common justice demands it. But to maintain an action *in rem* against a vessel and its apparel and tackle, and thus to maintain a lien on property, there must be a clear legislative authority.

But it would be going backward in the line of civilization to adopt the rule that a cause of action dies with the person unlawfully killed. We have observed that England has by Act of Parliament arrested the evil complained of, and now one man cannot illegally kill another man and deprive a family of the husband's support and yet suffer no legal responsibility therefor. If this were so, it would bring down to us the barbarism of the Middle Ages with none of its chivalry.

And again the Civil Laws of Hawaii, 1897, prescribe (Section 1109): "The common law of England as ascertained by English and American decisions, is hereby declared to be the common law of the Hawaiian Islands in all cases, except as otherwise expressly provided by the Hawaiian Constitution or Laws or fixed by Hawaiian judicial precedent, or established by Hawaiian national usage.........."

We have already shown that another rule was fixed by the Hawaiian judicial precedent in this territory. See decision in 2 Haw. 211. But beyond that, there is no common law of England extant on this subject at this time. The common law rule as to this class of actions was repealed in 1846. See 9th and 10th Victoria, "C." 93. The common law of England is

the *lex non scripta* of that kingdom, consisting of their immemorial usages, legal maxims and customs of the country, but when Parliament interferes and passes an act on the same subject it thereby destroys the common law rule in relation to the matter involved in the enactment. In this case, Parliament repealed the old common law rule by enacting a law which prescribed among other things, that the previous common law of England was to the effect that "no action at law was maintainable against a person who by his wrongful act may have caused the death of another person," but Parliament went on to say that: "Be it therefore enacted that whensoever the death of a person shall be caused by the wrongful act, neglect or default of another..........the representative of the party injured may maintain an action and recover damages in respect thereof..........and that such action may be maintained notwithstanding the death of the person injured;" thus clearly changing the common law rule, for this Act of Parliament has become the law of England.

It may be noted that England has taken a long step in advance of some of the courts of our own country on the question of holding the party responsible who wrongfully causes the death of another person. The old rule so much relied upon by the technical law learning of our country, no longer exists either here or in England, so far as the common law is concerned. 1 Blackstone Com. 89; *Tiffany on Death by Wrongful Act*, Page 210; *Sutherland on Statutory Construction*, Sec 142.

It is fortunate indeed that in these matters, the courts of Hawaii never were "fettered by the common law." This was and is an elightened and a civilized community. It early became the duty of the highest courts in the Kingdom of Hawaii to decide the case of *Kake v. Horton*, according to natural right and justice, and it did so under circumstances of peculiar interest. That decision remained the law of the Kingdom and now is the law of the Territory of Hawaii. It is over forty years since that decision was first rendered. It would ill become this or any other court, except for some potent reason, which reason

must be founded in natural justice, to overrule so well considered and so long established a rule of action as the one decided in .Kake v. Horton.

The question now presented is, were the officers and men on the Robert Lewers guilty of negligence resulting in the death -of the deceased? A duty was due the deceased by the Captain .and officers and men of the ship Robert Lewers. No man has any :more right to kill another from negligence than from an assault. If the defendant was guilty of negligence it mattered not whether the libellees knew of the defect in the chain or not. Cunu v. Boston Music Hall, 135 Mass. 414; Hayes v. Phila-.delphia, 150 Mass. 457.

A knowledge of a man's duty is presumed, and so there are no degrees to negligence. Cooley, in his work on Torts, at page '661, says that: "Often the injury itself affords sufficient prima .facie evidence of negligence."

The point in this case is, was there such a disregard of duty :as will hold the defendant responsible for damages? It is .admitted the deceased was killed by being struck by an iron bed plate weighing 25,000 pounds and that the accident occurred .by reason of the breaking of a chain, while that casting was being landed from the vessel named; that the casting thereby :swung round against the side of the ship, and killed the deceased .as he was climbing up the side of the vessel to get away from it.

The officers and men of the ship had exclusive control of the bed plate that was being loaded. They furnished the rope and the chain for the guy and lashings; they were in command of the situation; they were delivering the freight and it was their duty to deliver it to the consignee in a suitable and proper manner.

It seems that for the purpose of showing how the accident occurred, libellee brought into court a part of the chain that broke. It did not produce the part broken off nor the broken link or broken ring or broken hook forming the chain thus broken. It was defendant's chain and presumably in its possession, and the whole ought to have been produced in court.

It would then have been easy to observe whether there was a
latent defect in the iron that caused the break, or whether it
was a clean break of solid iron. If the broken link had been
produced, this could have been made apparent. This is a most
unfortunate circumstance.

The Court is not at all convinced that a reasonable man, under
the circumstances of this case, would have believed that an old
⅝ of an inch chain was strong enough to hold and safely
handle the vast weight of that casting; at all events it proved
not strong enough to do that, and the fact that the chain broke,
and thus caused the death of the deceased, is one of the
evidences of neglect.

The chain certainly did not look strong enough for the purpose.
It is in testimony that a chain is more dangerous for such use
than a rope, and the Court holds that it was the duty of the
officers and men of that ship when unloading a piece of machinery
weighing 25,000 pounds, to have used the very best and strong-
est appliances known to that business, and it was negligence to
have used any doubtful or uncertain appliances, or any rope or
chain of doubtful strength; and that in this case the unexplained
breaking of the chain is one of the proofs of negligence. *Caldwell.
v. New Jersey Straw Co.*, 47 N. Y. 282. See also the recent
case of *Stewart v. Ferguson*, 164 N. Y. 553; where a scaffold
provided by the master for a servant's use falls, and no other
cause of the fall was ascertained except as inferred from the
fall itself, the fall was held to be *"prima facie* evidence of the
negligence of the master" in an action by the servant to recover
damages received in consequence thereof.

See also *Esbery Cigar Co. v. Portland*, 35 Oregon 282;
*Garland v. Aurin*, 103 Tenn. 555.

It is in evidence that when a chain has been long in use, the
iron becomes brittle and weak. This was an old appearing
chain. The only question seems to be, did it look strong enough
at the time, and were the officers of the ship honestly deceived
by its looks?

The Court is compelled to believe that the weight of the testimony shows negligence on the part of the officers and men on that ship. The draymen were not trespassers by being where they were; they went after freight and they had the right to expect due care should be exercised by the officer and men of the ship in delivering it to them. The old rule that every man must lookout for himself no longer prevails; it is the duty of the officers on ship board to protect life in handling their freight. The officers of a ship hold positions of trust and they are required to exercise ordinary care in handling all freight.

In fact every common carrier of freight as well as passengers must so conduct himself as not to imperil the life or limb of those whose duty it is to come in contact with him.

The chain in this case broke, and the breaking of that chain was the cause of the death of the deceased. It is proven by at least two witnesses, that a chain is not the proper article to use in handling and landing great weights like this casting. See the cross examination of Captain J. F. Haglund, page 148 Testimony, who said: "we prefer rope because we can't always rely on a chain." He was defendant's witness, and the fact that "we can't rely always on a chain," shows negligence in the use of it.

No officer or man employed on the ship when this man was killed, was produced as a witness at the trial; there were some scientific experts who were not present at the accident, but who testified that the chain was strong enough, although it broke; and the broken part was not produced by defendants or seen by these witnesses; yet they seemed positive in their oft repeated assertions that a chain $\frac{5}{8}$ of an inch in size was strong enough, because as stated by them all, chain is tested at the factory when made. Yet none of them knew where this chain was made or whether tested or how long it had been used.

The Court is compelled to disregard this testimony and especially the statement made by these experts that such a chain had twice the tensile strength of a straight bar of iron of the same size.

It was also argued to the Court that the deceased contributed to his own death, because when the chain broke, he was in a dangerous position and ran the wrong way to avoid an injury; that is to say, that the deceased, when he with others was moving the dray so that the bed plate would rest squarely on it as it came down, should have anticipated that the chain would break and thus avoid any position whereby he would be hurt if the chain broke and that he should have ran another way when it did break.

In the presence of great and unforeseen danger, no man is expected to act with deliberation.

It is prescribed by Section 5344 of the Revised Statutes of the United States, "That every Captain or other person employed on any steamboat or vessel, by whose misconduct, negligence or inattention to duty, the life of any person is destroyed, shall be guilty etc., etc."

This is the rule in criminal cases; *United States v. Holtzhauer,* 40 Fed. 76, but it shows most clearly how careful the Congress of the United States is of the life and health of citizens.

It is not necessary in this class of cases that there should be any intentional wrong. Inadvertence is one of the chief elements of negligence; inattention may be and often is the strongest evidence of negligence. *Am. & Eng. Ency of Law,* Vol. 16, 396.

The Courts have held that ordinary care has relation to the situation of the parties and the business in which they are engaged, and varies according to the exigencies which require vigilance and attention.

*Fletcher v. Boston,* 1 Allen 15; *Penn. R. R. Co. v. Ogier,* 35 Penn. State, 60; *Am. & Eng. Ency. of Law,* Vol. 16, 401 and note; *Morgan v. Cox,* 22 Mo. 373; *Cooley on Torts,* p. 662; *Milwaukee v. Arms,* 91 U. S. 489-494.

The degree of care to be used is proportioned to the danger to be apprehended of inflicting an injury on others; in this case the danger was great, because the weight of the casting was

enormous and greater care was thus required. *Frink v. St. Louis,* 75 Mo. 595.

Ordinary care must be proportionate to the probability of injury. *Morgan v. Cox,* 22 Mo. 373; *Cooley on Torts,* 662; *Milwaukee v. Arms,* 91 U. S. 489-494.

Ordinary care is a question of fact in each case. *Griffin v. Auburn,* 58 N. H. 121; *Kinney v. Hannibal,* 80 Mo. 573; *Penn. Co. v. Franna,* 112 Ill. 398; *Ohio v. Calloren,* 73 Ind. 261; *Penn. v. Coon,* 111 Pa. St. 430; *Philadelphia v. Spearan,* 47 Pa. St. 300-5.

The Court finds for plaintiff. No damage is allowed for injured feelings. At the time of the death of deceased, he was receiving from $7.00 to $12.00 a week, of which it is assumed one-half of the smaller sum, or $3.50 a week, went to his wife. He was twenty-five years old when he was killed, and according to the testimony of Mr. Hutchins, the average term of life is 38 years, making a probable future term of deceased's life, thirteen years. Thirteen years of 52 weeks each, would be 676 weeks. At $3.50 per week, that would amount to $2366.00. The plaintiff seems to be a strong healthy woman, and ought to be able to help herself some, at least one-third of her living, which would amount to $788.88. Deduct that from $2366, which would leave $1577.12, for which amount and costs, let judgment be entered.      ,

NOTE: Affirmed on appeal, see *Schooner Robert Lewers v. Kekauoha,* 114 Fed. 849.