C. K. C. ROOKE *v.* THE QUEEN'S HOSPITAL, a Corporation, and C. R. BISHOP, S. M. DAMON, C. M. HYDE, J. O. CARTER and W. F. ALLEN, Trustees under the Will of Bernice P. Bishop.

C. R. BISHOP, S. M. DAMON, C. M. HYDE, J. O. CARTER and W. F. ALLEN, Trustees under the Will of Bernice P. Bishop *v.* THE QUEEN'S HOSPITAL, a Corporation, and C. K. C. ROOKE.

EXCEPTIONS FROM CIRCUIT COURT, FIRST CIRCUIT.

SUBMITTED SEPTEMBER 22, 1899.     DECIDED MAY 11, 1900.

FREAR AND WHITING, JJ., AND CIRCUIT JUDGE STANLEY IN PLACE OF JUDD, C.J., ABSENT.

T. C. B. Rooke devised and bequeathed as follows: *"I give and bequeath* all my real and personal estate, of what nature or kind soever, to my wife Grace Kamaikui Rooke to be used and enjoyed by her during the term of her natural life, and from and immediately after her decease, *I give and devise* the same to my adopted daughter Emma Rooke, * * * to be used and enjoyed by her during the term of her natural life, and her children for ever, *but* should the aforesaid Emma Rooke decease before me, the said testator, or decease without leaving any issue, then *I hereby give* and bequeath the same unto my Nephew and Godson, Creswell Charles Keane Rooke, * * * and his heirs for ever."

The will was dated Feb. 28, 1852. Emma married King Kamehameha IV, June 2, 1856, and gave birth to the Prince of Hawaii May 20, 1858. The testator made a codicil, changing one of the executors, May 29, 1858, and died November 28, 1858. Grace died soon after. The Prince died in 1862, the King in 1863 and Emma in 1885. Held,

(1) At common law, including the early statute *de donis*, Emma would take an estate tail, in which case C. C. K. Rooke would take a vested remainder; but

(2) Estates tail cannot exist in these islands.

(3)   At common law, before the statute *de donis*, Emma would take a
      fee simple conditional, in which case C. C. K. Rooke would take by
      way of remainder if a remainder could be limited on a fee simple
      conditional, and, if not, he would take by way of executory devise,
      if the words "without leaving issue" import a definite failure of issue
      and perhaps even if they import an indefinite failure of issue, and, if
      not, the heirs general of the testator would take the possibility of
      reverter; but

(4)   Fees simple conditional cannot exist in these islands.

(5)   Under Hawaiian law, Emma would take either (a) a fee simple or
      (b) a life-estate with (1) a vested remainder in the Prince or (2)
      alternate contingent remainders in the Prince and C. C. K. Rooke.

(6)   In either case the words "without leaving any issue" must be read
      in their natural sense meaning "without leaving any issue surviving"
      and not in either of their artificial senses meaning "without having
      had issue" or importing an indefinite failure of issue.

(7)   In either case the word "or" must be read in its natural sense and
      not as "and."

(8)   In either case, therefore, upon the death of Emma without leaving
      issue surviving her, C. C. K. Rooke became entitled in fee simple
      in possession, by way of executory devise or remainder as the case
      might be.

## OPINION OF THE COURT BY FREAR, J.

These are actions to quiet title to several pieces of land situated in the City of Honolulu, Island of Oahu, and more particularly described in the complaint.

The defendants demurred in each case, on the ground that the complaint did not state facts sufficient to constitute a cause of action.

These cases are of unusual interest and importance both because of the nature of the questions of law involved and because of the great value of the property in question and the charitable uses to which it is now and has long been devoted.

The argument occupied the greater portion of five days. Six briefs have been filed by the twelve counsel engaged in the case. Opinions on the case by six persons noted for their learning on real estate law in England and the United States have been re-

ferred to, several of which have been filed in full for the reasoning they contain. Among these may be mentioned the opinions of Professor John C. Gray, of the Harvard Law School, author of "Restraints on the Alienation of Property" and "The Rule against Perpetuities" and Sir Howard W. Elphinstone, Bart., one of the Conveyancing Counsel to the Chancery Division of the High Court of England, author of the work on "Conveyancing." These arrive at diametrically opposite conclusions. Even counsel who arrive at the same conclusion do so largely by different lines of reasoning.

The question is one of the construction of the will of Thomas Charles Byde Rooke, commonly called Dr. Rooke.

The material portion of the will is as follows: *"I give and bequeath* all my real and personal estate, of what nature or kind soever, to my wife Grace Kamaikui Rooke to be used and enjoyed by her during the term of her natural life, and from and immediately after her decease, *I give and devise* the same to my adopted daughter Emma Rooke, and her children for ever, *but* should the aforesaid Emma Rooke decease before me, the said testator, or decease without leaving any issue, then *I hereby give and bequeath* the same unto my Nephew and Godson, Creswell Charles Keane Rooke,   *   *   *   and his heirs for ever."

The will is dated February 28, 1852. Emma married King Kamehameha IV June 2, 1856, and gave birth to the Prince of Hawaii May 20, 1858. The testator executed a codicil to his will May 29, 1858 (substituting another person for one of the executors named in the will) and died November 28, 1858. The will was probated January 26, 1859. There was only one subscribing witness to the codicil but the law (Civ. Code, Sec. 1465) requiring two was not approved until May 17, 1859, and did not take effect until August 1, 1859. The testator's wife, Grace Kamaikui, died soon after. The Prince died in 1862. The King died in 1863. Queen Emma died in 1885.

Of the parties to these actions, C. K. C. Rooke, (C. C. K. Rooke in the will) usually spoken of as Colonel Rooke, contends that he took the fee simple under the will upon the death of Queen Emma without leaving issue surviving her; the Trustees of the Bishop Estate contend that the Prince took the fee and

that upon his death it went by the statute of descents one-half to his father and one-half to his mother and that upon the death of the father his half went under the statute of descents one-half to his consort and the other half, or one-fourth of the whole, to his next of kin under whom they, the Trustees, claim, the remaining three-fourths, which went to the Queen, being by her will in The Queen's Hospital; and the Queen's Hospital contends that Emma took the fee, which upon her death by her will went to it, The Queen's Hospital, or that at least, as conceded by the Trustees of the Bishop Estate, three-fourths went to the Hospital.

The language of the will might seem simple enough to a layman and, reading it, as such a person would read it, in the natural and ordinary sense of the words employed, the plain intention of the testator would seem to be to give a life-estate to his wife Grace Kamaikui and after her death a life-estate to his adopted daughter Emma and upon her death without leaving issue surviving her, the fee to his nephew Colonel Rooke, whatever might have been the case had Emma left issue surviving her. But in view of the argument and the state of the law upon questions of the kind here involved, the case cannot be disposed of so easily. And yet a consideration of the intricate learning upon the subject may lead to the same conclusion.

The portion of the will in question may be divided for convenience into three parts as follows:

"*I give and bequeath* all my real and personal estate, of what nature or kind soever, to my wife Grace Kamaikui Rooke to be used and enjoyed by her during the term of her natural life,

"and from and immediately after her decease, *I give and devise* the same to my adopted daughter Emma Rooke, \* \* \* to be used and enjoyed by her during the term of her natural life, and her children for ever,

"*but* should the aforesaid Emma Rooke decease before me, the said testator, or decease without leaving any issue, then *I hereby give and bequeath* the same unto my nephew and godson, Creswell Charles Keane Rooke, \* \* \* and his heirs for ever."

It is clear that a life-estate was given to the testator's wife by the first of these divisions and that upon her decease, soon after that of the testator, Emma, surviving, became entitled to an es-

tate of some kind under the second of these divisions. The question is, what were Emma and her son respectively entitled to under the second of these divisions and what was Colonel Rooke entitled under the third, in view of the circumstances of this case, that is, the son having died first and then Emma, Colonel Rooke surviving. But in order to solve these questions it is necessary to consider not merely the circumstances as they happened but circumstances that might have happened and to construe the will placing ourselves in the position of the testator who presumably intended to provide for such contingencies as might happen but could not foresee just what in particular would happen.

"The intention of the testator is admitted to be the pole-star by which courts must steer." But that intention may be difficult to ascertain owing to the infelicity of the language used or the failure to provide for certain possible contingencies. Even if it is clear, it may contravene fixed rules of law. And even if it is clear, taking the language in its natural sense, and contravenes no fixed rules of law, still it may be controlled by rules of construction. In England, the country of their origin, rules of property and of construction such as are likely to be involved in cases of this kind, even though they may have grown up under conditions that no longer exist, are adhered to with great rigidity, rules of construction often being given almost the fixity of rules of law. But in the United States the tendency is to reject what are considered rules of property in England if out of joint with the times, and to suffer rules of construction to yield readily to the manifest intention of the testator. By what rules is this court bound in cases of this kind? The statute (Civ. L. Sec. 1109) provides that, "The common law of England, as ascertained by English and American decisions, is hereby declared to be the common law of the Hawaiian Islands in all cases, except as otherwise expressly provided by the Hawaiian Constitution or laws, or fixed by Hawaiian judicial precedent, or established by Hawaiian national usage, provided, however, that no person shall be subject to criminal proceedings except as provided by the Hawaiian laws." Should this statute control the construction of a will

executed forty years, probated thirty-three years, and all rights under which became vested at least seven years, before its enactment? Should the common law of England, within the meaning of this statute, be taken as including early English statutes? What relative weight should be given to English and American decisions? How far has it been otherwise provided, fixed or established by Hawaiian laws, judicial precedent or national usage in regard to questions which have not been directly the subject of legislation or judicial precedent or in respect of which the evidence as to national usage is mainly negative, but where other integral parts of the system to which the rules in question belong have been expressly or by implication abrogated or rejected or in place of which other inconsistent rules have grown up? Hawaiian legislation, judicial decisions and national usage prior to the taking effect of the statute in question, January 1, 1893, undoubtedly followed the American tendency towards flexibility and adaptability to present and local conditions, rather than the English example of rigidity. See, for example, *Thurston v. Allen*, 8 Haw. 392. There exists even greater reason for departure from or failure to adopt English technical rules and precedents here than in the United States. And since the enactment of that statute the previous rejection of certain material parts of a system has been regarded as amounting to a rejection of other parts. See, for example, *Mossman v. Hawaiian Government*, 10 Haw. 434, 436.

1. The first question raised is, what estate would Queen Emma take at common law, that is, as we shall assume for the present and as was assumed in argument, the law of England prior to the Will's Act of 1837 but including the statute *de donis* passed in the year 1285. It seems to be pretty generally agreed, except by counsel for the Bishop Estate, that she would take an estate tail. Counsel for the Bishop Estate contend that she would take an estate for life and that her children would take a remainder in fee. Whether she would take an estate tail or not would depend upon whether "children" as used here would be considered a word of purchase or a word of limitation. It would be a word of limitation if it were a *nomen collectivum*, meaning

"issue" in its broader sense of "heirs of the body" or offspring of every degree, denoting what estate Emma was to have and that the children were to take, if at all, through her by descent, and not directly under the will.  It would be a word of purchase, if it were a *descriptio personarum* meaning "issue" in its narrower sense of offspring of the first degree, denoting that the children or such particular offspring were to take, if at all, not from or through the mother by descent, but directly under the will.

In support of the proposition that Emma would take an estate tail at common law and that "children" would be considered a word of limitation, *Wild's Case*, 6 Rep. 17, is relied on.  There the devise was "to Rowland Wild and his wife, and after their decease to their children," they having children at the time of the devise.  Clear though it seems, "the case for difficulty was argued before all the Judges of England."  It was decided that according to the plain meaning of the words Rowland and his wife took an estate for life and the children a remainder for life, and that no intention that the parents should take an estate tail was shown with sufficient clearness to overcome that plain meaning.  It was resolved also, that such would be the case even if there were no children at the time of the devise, since the words "after their decease" showed that the children were not to take immediately but after their parents.  It was further resolved that in the case of a devise simply to A. and to his children or issue, without the words "after his decease" or their equivalent, if he had children at the time of the devise, he and they would take jointly for life, that being the manifest intent and there being nothing to prevent its taking effect, but that if he did not have children at the time of the devise, he would take an estate tail, since there was a manifest intent that the children or issue should take, and as immediate devisees they could not take, because they were not in *rerum natura*, and by way of remainder they could not take, for that was not the intent, because the gift was immediate, and therefore A. would take an estate tail and "children" would be a word of limitation.  This last mentioned resolution is what is known as the rule in *Wild's Case* and is

what is relied on here. In the present case the devise is to "Emma * * * and her children," without such words as "after her decease," and she had no children at the time of the devise. Accordingly, under the rule in *Wild's Case* she would take an estate tail, unless a different intent is shown.

But other expressions in the will would at common law be deemed to support rather than negative the view that an estate tail was intended. Indeed it is contended that such an intention is so clearly shown, that Emma would take an estate tail at common law irrespective of the rule in *Wild's Case* and even if she had had children at the time of the devise. *Wood v. Baron*, 1 E. 259. For, it is argued, there is no direct devise to the children, but the testator makes a devise to Emma alone and then defines the nature of her interest by adding that it is to be used and enjoyed by her during her life and her children for ever; and the limitation over favors this construction, for it provides for the decease of Emma alone, and not for the failure of her children, in the testator's lifetime—as if the preceding devise were to her alone; and the devising portion of the will (above set forth), looked at as a whole (note even the underscoring) shows that but three gifts were intended, one to the wife, one to the adopted daughter and one to the nephew and godson.

The words introducing the devise over in case of Emma's "decease without leaving any issue" would also at common law support the theory of an estate tail. These were regarded as appropriate words for the introduction of a limitation over after an estate tail. Following a devise to A. indefinitely or to A. expressly for life, they would enlarge to an estate tail what would otherwise be a life-estate, and following a devise to A. and his heirs they would cut down to an estate tail what would otherwise be a fee simple. "Issue" was held to mean primarily "heirs of the body" or issue of every degree and required assisting context to be narrowed to "children" or issue of the first degree only, and the words "without leaving issue" primarily imported an indefinite failure of issue, that is, a failure at any time, whether in the lifetime or at the death of the first taker or at any time thereafter however remote. "Children" and "issue" in this will mean the

same thing. Is the referential construction to be put upon "issue" making it mean *"such* issue?" If so, the question would still remain, what issue? What issue would be intended here by "children" in the absence of the word "issue?" It is true, as argued by counsel for the Bishop Estate, that "children" is primarily a word of purchase, but it may be a word of limitation, and the circumstance that there were no children living at the time of the devise was regarded by the Judges who sat in *Wild's Case* as sufficient to overcome the presumption that it was a word of purchase, even if the devise were to A. and *to* his children. Here it is to Emma and her children, omitting "to." If it were clear that "children" was intended as a word of purchase, reading that portion of the devise by itself, the subsequent use of the word "issue" would not be sufficient to enlarge it. But that it tends to enlarge it is beyond dispute, and the use of the word "children" in its own place here being, to say the least, doubtful, the subsequent use of "issue" supports the theory that it was intended as a word of limitation.

The main contention for the Bishop Estate on this branch of the case is that the rule in *Wild's Case* does not apply where there is a devise to the parent *for life only* and an *express devise in remainder in fee* to the *children,* and that in such case the word "children" is not controlled by a gift over in default of "issue." It is conceded that the parent has in certain somewhat similar cases been held to take an estate tail where the word "son" was used instead of "children," in view of the entire context and perhaps partly upon the principle (stated in 2 Jarm. on Wills, 6th Ed. 452) that "the argument in favor of applying to the objects of a prior express devise words denoting a failure of issue, gains or loses force in proportion as such prior devise is more or less comprehensive in its range of objects," but it is contended that the rule is otherwise in the case of an express devise in fee to "children," according to the rule (stated *Ib.* 449), "that the words, *in default of issue,* or expressions of a similar import, following a devise to *children in fee-simple,* mean in default of *children,* and following a devise to children in tail,

mean in default of children or of issue inheritable under the entail. This is free from all doubt." As illustrations of the concession that "issue" is not construed merely referentially where the preceding devise is to a "son," counsel cite *Robinson v. Robinson*, 2 Ves. Sr. 225, where the devise was to H. "for his own life and no longer,  *  *  *  and after his decease to such son as he should have,  *  *  *  and for default of such issue," over, and *Lewis v. Puxley*, 16 M. & W. 733, where the devise was to J. "for life, and to his eldest legitimate son after his death; and in default of such issue, I give it in like manner to my son Richard; and in case he has no legitimate issue male," over; also *Mellish v. Mellish*, 2 B. & C. 520. To illustrate the contention for the referential construction where the devise is to "children," counsel cite *Goodright v. Dunham*, Doug. 264, where the devise was to A. "for life, and after his death, unto all and every his children, equally and to their heirs, and in case he dies without issue," over; also *Malcolm v. Taylor*, 2 R. & My. 416. The error in this argument is that it assumes that there is in the present case an express devise to the children, which is one of the main things to be proved. In the cases of the first class cited an estate tail was held in spite of the fact that there was an express devise to the son. In the cases of the second class the ruling was against an estate tail because there was an express devise to the children. In the present case it is not clear how the testator meant the children to take. In *Goodright v. Dunham*, for instance, not only was the devise to A. for his life only, but the devise to his children was express and direct, "unto;" it was "after his death;" and it was to the children with a word of division, "equally," and with the additional word "heirs" denoting a fee simple. In such case, of course the subsequent use of the word "issue" could not alter the plain meaning of the word "children." In *Robinson v. Robinson*, not only was the devise to H. for his own life only but, as if to emphasize this, the words "and no longer" were added, and then the devise to the son was direct, "to," and was expressly "after his decease" and the referential word "such" was actually in-

serted before "issue," and yet in spite of all this, the referential construction was not adopted and H. was held to take an estate tail. In the present case both "to" and "after her decease" are omitted. And as we have seen by the decision and the first resolution in *Wild's Case* the presence of the words "after their decease" was deemed sufficient to negative the idea of an estate tail, whether there were children at the time of the devise or not, but by the rule in that case, where such words were absent, although the word "to" was present, the existence or non-existence of children at the time of the devise determined whether the children should take with their parents jointly or the parents take an estate tail. That the children would take a remainder was considered out of the question.

The absence of such words as "after her decease" following the devise to Emma and preceding that to her children is the more significant here from the fact that the testator had already used similar words to separate the devise to Emma from that to his wife, namely the words, "and from and immediately after her decease." Against this it is argued that such words were necessary between the devises of the life-estates (to Grace and Emma) in order to show that they were not to be enjoyed jointly and to show in which order they were to be enjoyed, but that they were not necessary between the devise of the (assumed) life-estate to Emma and the (assumed) fee to her children, because the life-estate would of necessity come before the fee. This may weaken the argument so far as it is based on the fact that the testator employed or relied on different methods of separating the two estates in the two instances but it does not wholly destroy it and does not affect the argument so far as it is based on the absence of such words before the words "her children." As the devise to the children stands, it is immediate, to take effect upon the death of the testator, but since there were no children at the time of the devise, it could not have been intended as a direct devise, for if it was, the children if born after the death of the testator could not take at all—which clearly was not the intention. Such words as "after her decease" are natural

25

and usual where a remainder is intended and great weight is always placed upon their presence to show that the words following were intended as words of purchase, and likewise great weight is properly placed upon their absence as tending to show that the following words were intended as words of limitation.

The fact that the devise to Emma is followed by the words "to be used and enjoyed by her during the term of her natural life" is entitled to considerable weight as tending to show that she was to have only a life-estate and that therefore her children were to take by way of remainder, and this argument is given additional weight by the fact that the testator used identical words following the devise to his wife, who clearly took only a life-estate. But, first, this is offset in part by the fact that the testator used the appropriate word "heirs" to express the fee simple to Colonel Rooke and therefore tends, though perhaps not very strongly, to show that he did not intend to give a fee simple to Emma's children, because he omitted the word "heirs" there. It is replied, however, that this last inference is negatived by the use of the word "but" which implies that all there was, that is, the fee simple, had already been disposed of. The use of the word "but" is not of so great importance. It is naturally and not uncommonly used in introducing devises over after estates tail as well as after estates in fee simple. In *Bowen v. Lewis*, L. R. 9 App. Cas. 890, the devise was to T. "during the term of his natural life, and after his decease to his legitimate child or children (if there be any); but if he dies without issue" * * * to M. "and to her heirs and assigns for ever." The Lords apparently differed as to the importance to be attached to the use of the words "but" and "heirs," but a majority held that T. took an estate tail. See also the language of the devise in *Broadhurst v. Morris, infra.* Secondly, the fact that Emma's estate was expressed to be for life would have made but little difference at common law. Such was the expression in *Bowen v. Lewis*, and *Lewis v. Puxley, supra,* and in *Robinson v. Robinson, supra,* it was not only for life but "no longer," and yet in each case it was held that an estate tail was created. In

*Bowen v. Lewis*, not only was the word "children" used, as distinguished from "son," as well as the words "during the term of his natural life," but the words "after his decease" also were used. At common law a devise to A. would be for life only, though not expressly so stated. If "her children" here should be construed "heirs of her body," Emma's estate would be an estate tail by the rule in Shelley's Case, even though expressed to be for life only and even though the devise to the children were expressed to be "after her death." For that is a rule of tenure and is applied irrespective of the testator's intention. The words "to be used and enjoyed by her during the term of her natural life, and her children for ever" are only what the law would imply in the case of an estate tail. For, such an estate would be used and enjoyed by her for her life only and by her children forever. This is language that would naturally be used by a layman to express his understanding of an estate tail, though we should not expect a professional conveyancer to use such language. Thirdly, the form of the sentence favors the argument that the words in question were not intended to limit Emma's estate to her life and give her children a direct fee simple, for, as already pointed out, there is no break indicated by such words as "after her death" or "in remainder to" or by the repetition of the words "I give and devise" or even the word "to." The devise is to Emma "* * * to be used and enjoyed by her during the term of her natural life, and her children for ever," as if the testator were merely expressing what estate was given to Emma or how it should be enjoyed, namely, by her during her life, and by her children forever, in other words as if he intended this as merely a *tenendum* clause. By this construction the nearer preposition "by" rather than the more remote preposition "to" would be implied immediately before the words "her children," or, if the more remote "to" were implied, it would be in the sense in which it is used in the common expression "to A. and to her heirs" equivalent to "to A. and her heirs." In *Kendall v. Clapp*, 163 Mass. 69, the devise was to the testator's wife, "for her sole use and comfort during her

natural life, and to her heirs and assigns forever." After re-marking that the words "heirs and assigns" are the usual techni-cal words to signify a fee, the court said, "The absence before the words 'to her heirs and assigns forever' of technical phrases, such as 'after his death,' or 'in remainder,' commonly employed to denote a devise or gift in remainder, and also the fact that the whole limitation is in an unbroken sentence, lead to the same result." The court held that the wife took the fee, not a life estate with remainder over. In *Roper v. Roper*, L. R. 3 C. P. 32, the court said: "the form of the sentence 'unto my daughter Mary, wife of Alexander Roper, to her and her children for ever,' clearly shows that the children were to take through the mother, and that the words 'and her children' are words of limitation, and not of purchase, and consequently that an estate tail was created." In *Broadhurst v. Morris*, 2 B. & Ad. 1, the devise was to W. B. "and to his children lawfully begotten, for ever; but in default of such issue at his decease" over. It was held that W. B. took an estate tail. These cases differ from the present case, in some respects more favorably, in others less favorably to the contention for an estate tail, but they illustrate in some degree the effect of the form of the sentence.

The use of the words "for ever" after "children" is not sufficient to show a direct devise of the fee simple to the child-ren, although, if there were a direct devise, it would be suffi-cient to carry the fee simple. It is appropriately and commonly used in the case of a fee tail, as well as in the case of a fee simple; for, the "heirs of the body," as well as the heirs general, may last for ever. These words were used in connection with estates tail in several of the cases above cited. They, indeed, tend to show that "children" is used as a word of limitation meaning all issue, not merely issue of the first generation. See *Parkman v. Bowdoin*, 1 Sumner 359.

This case of *Parkman v. Bowdoin*, bears on the present case in several particulars. The devise was to J. B. S. "* * *

and to his lawful begotten children in fee simple for ever. But in case he should die without children lawfully begotten," over. He had no children at the time. Mr. Justice Story held that he took an estate tail. The devise to J. B. S. was not expressly "for life" but this was not considered as of so much consequence as that the devise to the children was not "after his decease." It will be observed that the words "to" and "in fee simple" were used and that "children" not "issue" was used in the devise over, and yet an estate tail was held. The devise being immediate the children would have to take by descent, if at all, unless they should happen to be born before the death of the testator.

In our opinion, therefore, at common law including the statute *de donis,* Emma would take an estate tail, and, if so, Colonel Rooke would take a vested remainder in fee simple and became entitled in possession upon the event, which has happened, of Queen Emma's decease without leaving any issue and without having barred the entail. As will appear, we might have assumed for the purposes of the case, that Emma would have taken an estate tail at common law, without setting forth our reasons, but in view of the important place this question occupied in the argument of counsel and the light that a discussion of it may throw upon other questions involved, we deemed it best to set forth our reasons.

2.    The next question is, would Queen Emma take an estate tail under Hawaiian law, if estates tail could exist under Hawaiian law?

It is contended on the one hand that she could take an estate tail, if at all, only by the rule in *Shelley's Case* and that since that rule does not obtain here (*Thurston v. Allen,* 8 Haw. 392) she could not take such an estate, and on the other hand that the ruling of the court in *Thurston v. Allen,* to the effect that the rule in *Shelley's Case* is not law here, was merely *obiter dictum,* and that that rule should now be held to be in force here. In our opinion that ruling was not *obiter* and certainly it ought not to be reversed in favor of a rule which is so often subversive of the testator's intention. Therefore, if Queen Emma

could take an estate tail, if at all, only by virtue of the rule in *Shelley's Case*, she could not take such an estate at all.

But it is not entirely clear that she would be obliged to rely on the rule in *Shelley's Case*. There is room for argument that she was expressly given an estate tail. If the devise were to "Emma in fee tail," the rule in *Shelley's Case* would have no application. If there were an express devise to her for her life only and a direct devise after her death to "her children" in the sense of "the heirs of her body" she would take an estate tail, if at all, only by the application of the rule in *Shelley's Case*. But if the devise were simply to her and "her children" in the sense of "the heirs of her body," the rule in *Shelley's Case* would have no application except in an historical and now practically obsolete sense. That rule of course does not determine the sense in which the word "children" is used. It applies, if at all, only after the meaning of that word has been determined. If, then, "children" is used here in the sense of "heirs of the body" and the words "to be used and enjoyed by her during the term of her natural life, and her children for ever" are merely the testator's method of describing the estate devised to Emma, so that the devise is equivalent to a devise "to Emma, to be enjoyed by her during her life and by the heirs of her body for ever," that is, to "Emma and the heirs of her body," she would take an estate tail irrespective of the rule in *Shelley's Case* so far as that rule has any real force at the present time. Certainly the decision in *Thurston v. Allen* would have no bearing upon such a case. Whether the language of the will should be construed as creating an estate tail aside from the application of the rule in *Shelley's Case,* in view of the meaning and weight that would in these islands at the present time be placed upon such expressions as "during her natural life" and "without leaving any issue," it will perhaps serve no useful purpose to consider. That question is of such a nature that it would be unsatisfactory to make its solution an important link in our chain of reasoning. Moreover, if it should be decided in the affirmative, it would still be necessary to consider whether

estates tail may exist here, and if it should be decided in the negative it would be necessary to consider the same other questions that would have to be considered in case it should be held that estates tail cannot exist here. For these reasons and in view of our opinion upon the question whether estates tail may exist here, we deem it best to proceed at once to the consideration of this question.

We have no hesitation in holding that estates tail have no place under the laws of Hawaii. It is true, as contended, that ancient Hawaiian land tenures bore a striking resemblance to those which prevailed in Europe in feudal times. A feudal system, not the feudal system of early English history, grew up in these islands. Estates tail were never a part of that system. Even in England they were of statutory origin. Nor was the English system ever imported into these islands. On the contrary the movement was in the opposite direction, as shown, among other things, by the establishment of the Land Commission in 1846 for the purpose of awarding titles in fee simple and abolishing what then remained of the Hawaiian feudal system. Estates tail are repugnant to the policy of the free alienation of property and have generally been considered out of place in the United States and have been abolished by statute or not recognized by the courts in most of the States and our early settlers from New England, here one remove further from old England, would not have been likely to introduce estates tail even if they had brought with them the main body of their laws and customs and established a colony of their own, instead of becoming themselves practically incorporated in the Hawaiian nation and merely exercising an influence, important though it was, upon Hawaiian legislation, customs and ideas. Accordingly, we find no instance of the recognition of estates tail or of their concomitants, such as fines and common recoveries, in the history of these islands. On the contrary, as pointed out by counsel, statutes have been enacted, which in important respects conflict with the idea of the existence of estates tail. For instance, the disposition of property at death is provided for as follows:

"Every person of the age of eighteen years and of sound mind may dispose of his or her estate both real and personal by will." Civ. L. Sec. 2122. The owner of an estate tail could dispose of it by will under this statute. But at common law estates tail could not be disposed of by will. "Whenever any person shall die intestate within this Republic, his property, both real and personal, of every kind and description, shall descend to and be divided among his heirs as hereinafter prescribed." Civ. L. Sec. 2105. Upon the decease of the owner of an estate tail intestate it would go to his heirs general under this statute. But it is of the very essence of an estate tail that it shall go to heirs special. An estate tail is an estate from which the heirs general and the power of alienation are tailed or cut off. In the case of an estate tail, the issue take, if at all, by descent, and not under the will of the creator of the estate, and if they take by descent they must take under the statute of descent, and a testator cannot by attempting to create an estate tail, alter the statute of descent by prescribing a course of descent inconsistent with that prescribed by the statute. In the case of an estate tail general, it is true, the heirs special, that is, the heirs of the body, if any, would, under our statutes, be the heirs general, and the estate would descend here as at common law so long as it lasted, that is, so long as such heirs lasted, to the heirs general, although such heirs would not be the same persons or take in the same manner here as at common law, where males were preferred to females, and the eldest male and his male descendants to the younger males, and all descendants, who took at all, took *per stirpes*, though of the same degree; and upon the failure of such heirs, that is, upon the termination of the estate, there would be nothing to go to the heirs general, that is, the collateral heirs or lineal ascendants. But in most cases of estates tail male or female or special, the heirs special would not be the heirs general and the course of descent indicated by the will would conflict with that prescribed by the statute. Under similar statutory provisions it was held that estates tail could not be created in New Hampshire. *Jewell v. Warner*, 35 N. H. 176.

3. Since, then, Queen Emma could not take an estate tail, what did she take? It is suggested first and most naturally that if she could not take an estate tail which was the product of the statute *de donis conditionalibus*, she would take what she would at common law before the enactment of that statute, that is, a fee simple conditional. In several of the United States where the statute *de donis* is not in force, the estate has been held to be a fee simple conditional. At common law a fee simple conditional was a special kind of conditional fee. If there was a conveyance to A. and the heirs of his body, A. was held to take a fee upon condition that he had issue and if he had issue he was considered as having performed the condition for some purposes. He could then convey in fee simple and, if he did not, his issue could after his death, whether they in turn had issue or not, but the estate would not descend to the heirs general. It would descend only to the prescribed heirs of the body, and if there were no such heirs, it would revert to the donor. Thus, somewhat inconsistently, the condition was regarded as performed for some purposes but as continuing for other purposes after the birth of issue. The statute *de donis* took away or tailed the power of alienation and so converted fees simple conditional into fees tail.

If Emma could and did take a fee simple conditional, then, since such an estate could not be devised, The Queen's Hospital could not take it under her will, and since the Prince did not survive his mother and since, even if he had survived her, the estate could not ascend to his father, neither the Hospital nor the Bishop Estate could take it through the Prince or the King, and therefore the question would lie solely between Colonel Rooke and the heirs general of Dr. Rooke. If a remainder could be limited upon a fee simple conditional (in regard to which there is much difference of opinion) Colonel Rooke would take a remainder in fee simple. If a remainder could not be limited on a fee simple conditional Colonel Rooke would take by way of executory devise if the words "without leaving any issue" import a definite failure of

issue, for although at common law lands could not be devised at all, and under the Statute of Wills passed in the reign of Henry VIII. they could not be devised unless the devisor died seised of them, so that if he created a fee simple conditional by conveyance *inter vivos* he could not devise the possibility of reverter, for he would not be seised at his death, yet in a case like the present where the fee simple conditional is created by will, the devisor would be seised at his death, and (under the Wills Act, 1837, and) under our statute a possibility of reverter or a right of entry may be devised. Perhaps Colonel Rooke would take by way of executory devise even if the words in question imported an indefinite failure of issue, though this is, to say the least, extremely doubtful. It is so considered by some because the doctrine of remoteness was not invented until long after fees simple conditional ceased to exist and more particularly because the executory devise could be barred by the tenant *inter vivos* at any time after the birth of issue of the original donee.

4.　But fees simple conditional cannot exist in these islands. As they have not existed in England since the enactment of the statute *de donis* in the reign of Edward I., the law relating to them is but little known. Such estates, of course, never existed under the Hawaiian feudal system, and our early settlers from the United States would be even less likely to introduce them than to introduce estates tail. Such estates, likes estates tail, had their origin in conditions that no longer exist. The law governing them is technical, and repugnant to the natural meaning of the language which is held to create them. They are not in harmony with the present age and, like estates tail, conflict with our statutes of descent and wills,—they could not be devised and did not descend to the heirs general.

5.　Since Queen Emma could not take either a fee tail or a fee simple conditional under Hawaiian law, she obviously would take either a fee simple (absolute or defeasible) or a life estate with (vested or contingent) remainder in fee simple in her children. In some of the States in which fees tail do not exist, the estate is considered a fee simple in the first taker, in others a life-

estate in the first taker and a remainder in fee simple in the issue, while in others it is considered one or the other according to which appears to most nearly carry out the intention of the testator. In this case it is contended on the one hand that Emma should be held to take a fee simple because that more nearly than a life-estate with remainder resembles a fee tail or fee simple conditional (one or the other of which, it is contended, the testator intended to give) for upon the birth of issue the tenant could by conveyance convert a fee simple conditional into a fee simple and cut off both the heir and the possibility of reverter and even before the birth of issue could by common recovery convert a fee tail into a fee simple and cut off both the heir and the remainderman, and consequently since the testator presumably intended that the first taker should have this power of alienation, his intention would be more nearly carried out by giving Emma a fee simple; that the form of the gift favors the theory of a fee simple, for the gift is directly to Emma only, the children being mentioned only in the limitation of the gift to her; that the gift being immediate, the children, unless their mother took the fee so that they could take by descent from her, would not be able to take at all in case they should not be *in esse* at the death of the testator; that the words "die without leaving any issue," if they import an indefinite failure of issue, favor this construction; that the policy of the law is against the postponement of the power of alienation, and if Emma took only a life-estate, the property would be tied up at least until a child should be born and perhaps until the termination of the life-estate; and that it is better to hold in all cases (without attempting to most nearly carry out the intention of the testator) that what would be an estate tail at common law would be a fee simple here, in order that there may be greater certainty in titles. On the other hand it is contended that regard should be had to the intention of the testator so far as possible and that it would more nearly carry out such intention in this case to give Emma a life-estate only, with remainder to her children, because the words "to be used and enjoyed by her during the term of her natural

life" show that she was intended to hold for life only, and it was intended that her "children" should take, which they could not do if Emma would take, if at all, a fee simple, but should die before the testator, or if the children should die before her in case she survived the testator; and that it was intended that of her heirs her "children" only should take, whereas if she took a fee simple her heirs general would take; and that the words "die without leaving any issue," if they import a definite failure of issue, support this construction. Probably the first of these lines of argument would appeal more strongly to the English mind, the second to the American mind. Which should be sustained would be of consequence to The Queen's Hospital and the Bishop Estate only, the former contending for a fee simple in Emma, the latter for a life-estate with remainder; and, though counsel for Colonel Rooke join forces with the Bishop Estate in favor of a life-estate with remainder, it is immaterial to him which view is taken, as the sequel will show. In either case, whether he would take or not would depend upon the construction of the subsequent words "or" and "die without leaving any issue." We shall therefore now proceed to consider the question of the construction of these words.

6. First, the words "decease without leaving any issue." The argument upon these words assumes that "or" is to be taken in its natural sense. The question then is whether these words are to be taken in their natural sense as meaning "decease without leaving any issue surviving her" or in one of the following artificial senses: (1) "decease without having had any issue," (2) "decease and her issue become extinct at any time."

Counsel for the Bishop Estate contend for the first of these artificial constructions. The argument applies only in case Emma would take a life-estate and the children a vested remainder, that is, vested at the death of the testator if they were then *in esse* or at their birth in case they should be born afterwards. The argument is that the expressions "die without issue" and "die without having issue" have come to have in law the meaning of "die without having had issue" and that the ex-

pression "die without leaving issue" has received the same construction, the object of such construction being to prevent the divesting of a vested estate. In this case if the children would take a vested remainder and if the gift over to Colonel Rooke would take effect only in case Emma should die without having had any issue, then, since she did have issue, the gift over could never take effect, but upon the death of the Prince his estate would go by descent to his parents. The case chiefly relied on is *Treharne v. Layton*, L. R. 10 Q. B. 459, in which the devise was to M. H. for life and after her death to her children and in case M. H. "dies leaving no issue," over. The words "leaving no issue" were held, on authority rather than reason, to mean "having had no issue." To so hold would be, as remarked by one court, like holding that a man who died penniless, died leaving a large fortune if he had once had a large fortune for a brief period though he had lost it years before his death. Such a construction may have carried out the intention of the testator in a majority of cases under the circumstances under which it originated, and may carry it out even now in some cases, but the intention would most frequently be carried out by giving the words their ordinary and natural meaning unless some special reason should appear for giving them a different meaning. Whether we ought to follow authority in favor of the artificial meaning especially in a case like the present, in which the children would be held to take a vested remainder, if at all, by implication and not because the testator has clearly expressed such an intention, it is unnecessary to decide, for the rule is one of construction which even at common law yielded readily to the otherwise manifest intention of the testator, and such other intention of the testator would at common law be held sufficiently expressed in the present case. The rule is supported on the theory that it carries out the intention of the testator, it being supposed that the testator, after clearly giving a vested estate to a child, probably did not contemplate that the child would die before its parent and so probably did not intend that the child's estate should be devised in the event of its death in its parent's

lifetime, especially as, in such case, if the child left a child, the latter would take nothing, which, it is supposed, could not have been the intention of the testator. But if the testator shows an intention that the gift over shall take effect in some event, notwithstanding the birth of a child, the foundation of the rule is removed. In the present case the testator expressed an intention that the gift over should take effect in case Emma should die before the testator, even though she should leave issue, as well as in case she should die at any time without leaving issue. Consequently there can be no presumption that he intended that the children should take an indefeasible estate in all events if there should be any children. This view is supported by *In re Ball*, L. R. 36 Ch. Div. 508; 40 *Ib.* 11, where the words were "die without leaving issue male." These words were construed in their natural sense, because the testator manifested an intention that the gift over should take effect even though the first taker should leave issue unless the issue were male.

The other question upon the construction of these words is whether they should be read in their natural sense as meaning "decease without leaving any issue at her death" or in their artificial sense of "decease and her issue become extinct at any time," that is, whether they import a definite or an indefinite failure of issue. Emma may be held, as already stated, to take (1) a fee simple or (2) a life-estate with remainder in her children, which remainder may be (a) vested in the children on the testator's death of at their birth or (b) contingent upon their surviving her.

If the children took a contingent remainder, Colonel Rooke would take an alternate contingent remainder. It is obvious that if such were the case the words in question must necessarily import a definite failure of issue.

If the Queen took the fee or if the children took a vested remainder in fee, Colonel Rooke would take, if at all, by way of executory devise, because a remainder cannot be limited on a fee simple. In such case, if the words in question import an in-

definite failure of issue, the gift over would be void for remoteness, while if they import a definite failure, it would be good. The words "on failure of issue" were held to import an indefinite failure without doing violence to their natural meaning, although sometimes doing violence to the intention of the testator.   The words "without issue" were construed the same way, with sometimes the absurd result that they were made to mean their direct opposite, "with issue," the words "if she should decease *without* issue" being made to mean "if she should decease (without issue or) *with* issue (and such issue should become extinct afterwards)."   Still, these words are somewhat ambiguous and such is sometimes the testator's meaning.   The same construction was still more absurdly put upon the words "without leaving issue," when applied to real estate.   More absurdly still these words "without leaving issue" received one construction when applied to real estate and another when applied to personal estate, even when used, as in the present case, but once and in the same sentence with reference to both real and personal estate mentioned together as constituting the residue.   The presumption that these words import an indefinite failure of issue grew up under conditions that no longer exist and at a time when executory devises were not permitted at all.   It is now generally conceded that the words "without leaving issue" naturally mean "without leaving issue surviving" and that to hold that they import an indefinite failure of issue would in most instances be in violation of the manifest intention of the testator. Accordingly, the rule supporting such construction has been abolished by statute in England and in some of the United States. In other States it is either rejected by the courts or regarded as having so little force as to be overcome by very slight expressions pointing in the other direction.   In *Thurston v. Allen,* *supra,* the court substantially held that the common law rules for the construction of wills should not be followed here where to follow them would result in overriding the manifest intention of the testator.   We are in reason bound by that decision to hold

that the words in question import a definite failure of issue in order to give effect to the manifest intention of the testator. This conclusion is supported, and perhaps would be required in the absence of the decision in *Thurston v. Allen,* by the ruling that estates tail cannot exist in these islands.   For at common law, in the case of personal property, there could be no estate tail with remainder over, and, of course, an executory bequest after an indefinite failure of issue would be void for remoteness, and therefore, in order to give effect to the intention of the testator, by way of executory bequest, the words "decease without leaving issue" had to be construed in their natural sense importing a definite failure of issue; but, in the case of real property, if such words were construed to import an indefinite failure of issue, the devise over would be good as a remainder after an estate tail,—the prior estate, if not an express estate tail, being enlarged or reduced to an estate tail by implication from the subsequent use of the word "issue."   But since, by hypothesis, the prior estate in this case is a fee simple (enlarged from or not cut down to an estate tail, because estates tail cannot exist here) and since the devise over is an executory devise (because a remainder cannot be limited on a fee simple) the same reason must exist here in the case of realty as existed at common law in the case of personalty for giving to the words in question their natural meaning importing a definite failure of issue.   This argument is stated more particularly with reference to the supposed case of a fee simple in the Queen.   If it applies at all, it applies with greater force, so far as the intention of the testator is concerned, to the supposed case of a fee simple in the children.   For we can hardly impute to the testator an intention to give a vested remainder in fee to the children and then make it defeasible upon an indefinite failure of the issue of the Queen. We may add that the words "leave" and "leaving" are used many times in our statute of descents and uniformly in the sense of leave or leaving living at the death, as, in the phrases "if he shall leave no issue," "if A. dies leaving no children," &c.

7.   Secondly, the word "or."   Counsel for the Bishop Estate

and The Queen's Hospital contend that this word should be changed to "and." If it should be so changed, the devise over to Colonel Rooke could not take effect unless both events happened, that is, the death of Emma (1) before the testator *and* (2) without leaving any issue, in which case, since the Queen did not die before the testator, the devise over could never take effect, whether she left issue or not; while, if such change should not be made, the devise over would take effect upon the happening of either event, in which case, since Emma died without leaving any issue, the devise over would take effect, whether she died before the testator or not. The ground upon which the change is urged is that it is necessary in order to carry out the intention of the testator, for, if the change were not made and Emma had died before the testator and had left issue, such issue could not take, but the estate would go over to Colonel Rooke, although (as it is contended) the testator evidently intended that the issue should take if there were any to take; and, that, although, as matter of fact, Emma did not die before the testator, yet she might have died before him, and in construing the will we must put ourselves in the position of the testator at the time he made it and not construe it differently according to the course which events happened to take afterwards.

This is not a question of the construction of an ambiguous word, for the meaning of the word "or" is perfectly clear. It is a question of striking out one word and substituting another in its place. This is permissible where it is clear from the whole will that the testator intended the proposed substitute but inserted the wrong word by mistake. If "or" is changed to "and" here, it will not be because the language of the rest of the will shows that the testator intended to use "and," but rather because it would be considered more reasonable in him to have used that word and therefore it would be conjectured that he intended to use it. "Or" often has been read "and" and "and" has been read "or" upon such a conjecture and as an exception to the rule that the language of a will cannot be changed merely upon conjectured intentions. It is contended that this exceptional ruling

in regard to the word "or" has become established by several
centuries of precedents in England and that it should therefore
be adhered to now. True, it has never been applied in a case just
like the present, but it is contended that the reason for the rule
requires, for the sake of consistency, its application to this case.

The leading case is *Fairfield v. Morgan*, 2 B. & P. N. R. 38.
The rule is stated thus: "If real estate be devised to A. in
fee simple with a limitation over in the event of A. dying under
twenty-one *or* without issue, the word 'or' will be read 'and,' and
the gift over will be construed to take effect only in the event of
A. dying under twenty-one *and* without issue." Hawkins, Wills,
203. Various considerations led to the adoption of this rule.
One was that the words "or" and "and" are not infrequently
used in common parlance without a due regard to their respec-
tive meanings. Hence the courts were more ready to change
these words than to change other words. Then, again, the courts
found it easier to make the change in the first place when the
two events were death under age (twenty-one) and without issue,
for in such case there would be some reason for supposing that
the testator intended that the gift over should take effect only
in case the first taker should die when too young to dispose of the
property by deed or will and when he left no lineal descendant
to inherit it from him, but that if he should arrive at the age
of majority he should have the full power of disposition and
that it should be left to him to make what disposition he chose for
his issue. This reason, of course, would not apply in the present
case where the first event is death, not under age, but before
the testator. But the principal object of the rule is to prevent
disinheriting issue. For it is assumed that the testator, by mak-
ing the devise over upon the death of the first taker without
*issue* one of the two events, intended a benefit to the issue,
if there were issue, and unless "or" were read "and," the issue
would take nothing if the first taker should die under age and
leave issue. This may be regarded as the principle upon which
the rule rests and hence it is suggested (1 Jarm. Wills, 6th Ed.
473) that it be extended "to every case where the gift over is

to arise in the event of the preceding devisee or legatee dying under prescribed conditions, *or* leaving an object who would, or, at least, who *might* take a benefit derivatively through the devisee or legatee, if his interest remained undivested, and to whom, therefore, it is probable the testator intended indirectly a benefit, not dependent upon the circumstance of the devisee or legatee dying under the prescribed circumstances or not." And the rule has been applied in a number of cases where the events described are other than death under age and without issue, as, where the second event is "without leaving any husband," or where the first event is death under some other age, as "twenty-five," or even "in the lifetime of" some other person. Should the rule be applied in the present case?

If the will should be construed as giving Emma the fee simple, it is obvious that the reason for the rule would not apply. For, although the rule originated and is generally stated with reference to cases in which the prior devisee would take a fee simple, yet in this particular case, since the first event is death before the testator, and not death within a particular age after the testator, changing "or" to "and" would not aid the children in case their mother should die before the testator, for in such case the children could not take at all, not derivatively through her, because the devise to her would have lapsed, and not directly from the testator, because there was no direct devise to them.

The only question therefore that remains is whether the rule should be applied in case the will should be construed as giving Emma a life-estate with remainder over.

We have seen already that the rule in question violates the more general rule which forbids a change of words upon mere conjecture as to the intention of the testator. It goes further than this. Under some circumstances it actually violates the clearly expressed intention of the testator. While it gives effect to the assumed intention of the testator in one event it frustrates his expressed intention in another event. It gives the estate to the issue in case the first taker dies under age leaving issue, but it does not give it to the devisee over in case the first taker

dies over age without leaving issue. It is possible that the testator would have written "and" if he had contemplated the death of the first taker under age and leaving issue, but it is also possible that he overlooked the possibility of such an event or that he took it for granted that so improbable an event would not happen; and if he had foreseen the possibility of such an event and had intended the issue to take, he might and probably would (rather than write "and" in place of "or,") have struck out the words "die under twenty-one" so that the devise over would take effect upon the death of the first taker at any time without issue. But assuming that changing "or" to "and" would effectuate the general intention of the testator in case the first taker should die under the prescribed age and leave issue, yet in the event of death after such age leaving no issue and even never having had issue, the intention that the gift over should then take effect would be frustrated and intestacy as to the reversion or remainder would result. As a result of revulsion against the speculative method of construction, courts have taken the position in recent years that this rule ought not to be extended beyond the cases in which it has become established by precedents. *Gray v. Pearson*, 6 H. L. Cas. 61; *Coates v. Hart*, 32 Beav. 349.

Accordingly, as a rule, it is not applied where the first estate is less than a fee simple. For instance, although the main reason for the rule would seem to apply even more strongly in the case of an estate tail than in the case of a fee simple, for the intention to benefit the issue is clearer (*Holcomb v. Lake*, 25 N. J. L. 607) still it is held in England that the rule does not apply in the case of an estate tail, (which Emma would have taken in this case at common law). *Mortimer v. Hartley*, 6 Exch. 47, 61. See also *Parker v. Parker*, 5 Metc. 134, 140. And, of course, in this particular case it could not apply if Emma took an estate tail—for the same reason (stated above) why it could not apply if she took a fee simple. And, although the main reason for the rule would seem to apply still more strongly where children are made the express objects of the prior gift (1 Jarm.

Wills, 473, and see *Hasker v. Sutton*, 1 Bing. 510) as would be the case here if Emma were held to take a life-estate with remainder to the children, yet it is held that the rule does not apply in such case. *Cooke v. Mirehouse*, 34 Beav. 27,—where the devise was to the testator's son John for life when he arrives at thirty-one, "and after his death, to his eldest son and his heirs forever. In case my son John should not live to that age *or* not have any son, then in trust for my second son Evelyn." John attained thirty-one, married, and died without having had any issue. The Master of the Rolls said: "It is clear that the testator did not intend John to take any interest unless he attained thirty-one; and the words of the will, as they stand, import, that if he died after attaining that age without having had a son, the property is to go to *Evelyn* for life, and then to the other persons under the subsequent limitations. Then why is the court to alter the words of the will for the mere purpose of excluding them? The court has gone a great way to prevent a son being excluded, but here I am asked to change the words and do violence to the terms of the will, and that for the purpose of excluding the second son and of defeating all the subsequent limitations. I never knew of such a case. Even if the court could look at the events which have happened, and modify the words of a will, after ascertaining what the intention of the testator would have been if he had foreseen what would have happened, it is plain that the testator would not have turned '*or*' into '*and*' for the purpose of excluding his son *Evelyn* and the persons he intended to take under the subsequent limitations." Similar language might well be applied to the present case, *mutatis mutandis*. See also Hawkins, Wills, 204. Although, as above indicated, Jarman thinks the principle of the rule would apply in the case of a life estate with remainder to the issue, yet his suggested extension of the rule (above quoted) would not cover a case like this, and he concedes that the authorities are against him. 1 Jarm. Wills, 478. Thus, so far as mere authorities are concerned, they do not require "or" to be changed to "and," but rather support the view that it should be read in its natural sense.

There exist special grounds for this view in this case. The word "decease" is repeated, the words being "should the aforesaid Emma Rooke decease before me, the said testator, or *decease without leaving any issue.*" This of itself might not be sufficient to warrant the rejection of the rule, if it would otherwise apply, but it tends to show that the testator meant what he said. Similar repetitions are, however, found in some cases in which "or" has been changed to "and." Again, the testator was well along in years and Emma was young. He might, especially as he was a physician, have regarded it as most unlikely that (1) Emma should marry, (2) have a child, (3) *die before the testator* and (4) *die before the child*, and (5) the child survive the testator, and so might have thought it unnecessary to make a special provision for such a combination of events. Again, if he intended that Emma should have an estate tail (which she would have had in England and he was an Englishman) he could not, for reasons stated above, have intended "and;" and, since the change from "or" to "and" is made only on the ground that it is required in order to carry out the intention of the testator, should it be made merely because the estate is held to be different from that which he intended, for the reason that that which he intended could not be created here? Further, the first event is death before the testator. If it had been death in the lifetime of a third party, it might have occurred after the death of the testator, in which case the testator could not have changed his will to suit the event. But in the present case, if Emma had died before him leaving issue, he could have changed his will so as to give the estate to the issue. The improbability of the concurrence of the events above mentioned and the probability that he intended to give Emma an estate tail and not make a direct devise to the issue, support this ground. Lastly, his attention was drawn to the will after the birth of Emma's issue and at a time when that birth must have been prominently before his mind, namely, only nine days after the Prince was born, when the testator made a codicil to his will, and yet he made no alteration in the will except to change one of the executors. He did not alter the will so as to make a direct devise to the Prince,

nor did he change "or" to "and" on the chance that Emma might die before him leaving issue, nor did he strike out the devise over to the nephew, although, if "and" were meant, that devise could never take effect. Apparently he intended that if Emma should die at any time without leaving issue, the estate should go to his nephew. Counsel seemed to assume in argument that the codicil was invalid. We do not deem it necessary to express an opinion upon the question of its validity or invalidity, as independently of the argument based on the codicil, in so far as it may assume its validity, the conclusion we have reached would remain unaltered.

The cases mainly relied on for changing "or" to "and" in this case are *Denn v. Kemys,* 9 East 366 (1808) and *Wright v. Kemp,* 3 T. R. 470 (1789). In the first mentioned of these the devise, after a prior life estate to A., was to B. in fee, but if B. die before A. *or* if she die without heirs of her body, over. This case is distinguishable from the one at bar in that (1) the prior devise is in fee and not, as assumed in the present argument, for life with remainder to the issue and (2) the first event is death in the lifetime of a third party, not, as here, in the lifetime of the testator. In the second case there was a surrender *inter vivos* (not a devise) to the use of the surrenderer himself for life, then to his wife during widowhood, then to his son for life, then to his son's issue, but in case his son should die in the lifetime of the surrender *or* without issue of his body, then to the heirs of the surrenderer forever. It will be noticed that the prior devise was for life only and the first event was death in the lifetime of the surrenderer himself. The attention of the court seems not to have been directed to the distinction between the case of a life-estate and that of a fee simple with reference to the application of this rule, but was directed more particularly to the question whether the rule applied as well in a surrender of copyhold premises as in a will and whether the son's remainder was vested or not. If the case is not distinguishable from the present case, it is also not distinguishable from the case of *Cooke v. Mirehouse, supra,* decided seventy-five years later, in which the court decided otherwise although *Wright v. Kemp* was called to its

attention, and we ought, so far as mere authority is concerned, to follow the later rather than the earlier case. But there are important points of difference between *Wright v. Kemp* and the present case. For instance, in that case it was held that the son took a vested estate in the surrenderer's lifetime; in this Emma could not take any estate in the testator's lifetime; in that the surrenderer could not have changed the conveyance in case events should not turn out as he contemplated; in this the testator could change his will if Emma should die before him leaving issue.

Thus, in any view, whether Queen Emma took an estate tail, a fee simple conditional, a fee simple, a life-estate with vested remainder in the Prince or a life-estate with alternate contingent remainders in the Prince and Colonel Rooke, the latter, upon her death without leaving any issue surviving her, became entitled (by way of executory devise or remainder, as the case might be) to the lands in question in fee simple in possession.

The exceptions to the order of the Circuit Judge overruling the demurrers in the first and sustaining the demurrers in the second of these cases are overruled, and the cases are remitted to the Circuit Court for such further proceedings as may be proper in conformity with the foregoing views.

*Magoon & Silliman* and *I. M. Long* for C. K. C. Rooke.

*A. S. Hartwell, Robertson & Wilder, W. R. Castle* and *P. L. Weaver* for The Queen's Hospital.

*Kinney, Ballou & McClanahan* and *H. Holmes* for the Trustees under the Will of Bernice P. Bishop.