JOHN H. MAGOON, ALFRED K. MAGOON, EATON H. MAGOON AND MARMION M. MAGOON, TRUSTEES UNDER THAT DEED OF TRUST MADE BY EMMELINE M. MAGOON, v. HONG YEE CHUCK AND ALBERT E. HARRIS.

No. 1952.

ARGUED OCTOBER 28, 1930.                    DECIDED DECEMBER 2, 1930.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY PERRY, C. J.

This is a statutory action to quiet the title to a piece of land containing an area of 2.72 acres, situate in Manoa, Honolulu. Trial was had before a jury which rendered a verdict wholly in favor of the defendants. The case comes to this court upon exceptions to rulings on evidence, to rulings on instructions, to the verdict and to the judgment.

The land was granted by Royal Patent (Grant) 207 to Koloalu (w). The patentee would seem to have early disappeared from the scene. There is no evidence tending to show how long she occupied the land or what she did with her title. There was evidence tending to show that Keau (k) and Kamakaone (w), husband and wife, occupied the land for a period of time. Keau died about

1886 or 1887. Kamakaone died later, but in what year does not appear. Subsequent to the death of these two occupants Kala, their son, and Kaui, his wife, lived on the land until their deaths. Kala died December 6, 1909, and Kaui died January 4, 1921. Under date of March 18, 1892, Kala and Kaui executed a mortgage of the land to H. Dimond for the consideration of $150. This mortgage was recorded on March 22, 1892. Under date of December 23, 1892, Kala and Kaui executed another mortgage of the land to O. P. Emerson for a consideration of $350. This second mortgage was recorded on December 27, 1892, and was released on December 26, 1896. On August 28, 1896, Kala and Kaui executed a deed of the land to Emmeline M. Magoon. This deed contained a full covenant of warranty in the ordinary form. It was recorded on the day of its execution. Mrs. Magoon, on February 24, 1919, by deed recorded on the following day, conveyed the land to her four sons, the present plaintiffs. It should be added that in their deed to Mrs. Magoon Kala and Kaui reserved to themselves a right for their lives and for the life of the survivor to occupy the land and to take all of the rents, issues and profits thereof.

The two defendants are the grantees named in a deed from Rose Hao and her husband, Makahi, dated July 30, 1926. At the close of the plaintiffs' case the defendants' attorney, in making his opening statement to the jury, said: "We are claiming through the fact that we are in possession of the land, on the theory that anyone in possession is entitled to possession unless the plaintiffs can show a better title. * * * These people" (meaning Kala, Kaui and Rose) "all lived there during the lifetime of Keau and Kamakaone and on the death of Keau and Kamakaone they became joint disseizors and Rose Hao, being there now in possession of the land, is entitled thereto, she being the survivor of joint disseizors."

In addition to the facts above stated relating to the occupancy by Kala and Kaui and to the execution of the two mortgages and the deed, all of which are shown by undisputed evidence, there was ample evidence tending to show that for more than the statutory period prior to the death of Kala in 1909, Kala and Kaui held and occupied the land with all of the elements of an adverse holding and that Rose Hao lived on the land under them. There was also ample evidence tending to show that on behalf of Emmeline M. Magoon, their grantee under the deed in which they reserved a life occupancy, Kala and Kaui at first and Kaui later held and occupied the land with all of the same elements of an adverse holding from the date of their deed in 1896 until Kaui's death in 1921 and that Rose lived, as before, under them during this period. (This action was commenced on March 5, 1928.) Rose herself testified, repeatedly and unambiguously, that it was only after Kaui's death in 1921 that she, Rose, claimed to own the land and entertained the thought that she was the owner. On the other hand there was some evidence tending to show that Rose, who at the time of the trial was seventy-five years of age, began living on the land, with Kala, during the lifetime of Keau and Kamakaone, going there as their "keiki hanai" and at their invitation and that after the death of these two she remained on the land and continued living thereon with Kala and Kaui until they respectively died and thereafter continued to live on the land until the day of the trial. There was also evidence tending to show that Kala, Kaui and Rose "lived together," Rose "in the same way" as Kala and Kaui, and that Rose, while she "lived together" with the other two, was not on the land by their permission but was there "through stubbornness." There was no evidence whatever of any statement, agreement or understanding between Kala and Kaui on the one hand and Rose on the

other as to whether the holding by the three, if it was a holding by the three, was intended by them to result, if successful as an adverse holding, in a tenancy in common or in a joint tenancy.

In submitting the case to the jury the presiding judge refused to give the following instruction, being plaintiffs' number 13: "If you find and believe from the evidence that plaintiffs or those under whom they claim acquired title to the land in dispute by adverse possession as defined herein prior to January 4, 1921, the date of Kaui's death, and that Rose Hao, under whom defendants claim title to said land, did not claim ownership to said land until some time after such date, then you must find for plaintiffs." This instruction should have been given. Its essence was that if, prior to January 4, 1921, Kala and Kaui had actually acquired title by adverse possession and that Rose did not claim ownership until after that date, the verdict must be for the plaintiffs. If, prior to the date named, Kala and Kaui had already acquired title by adverse possession, no acts on Rose's part or on the part of her successors in interest after 1921 could have availed to deprive Kala and Kaui or their grantees of the title. The rule of procedure that, in view of the fact that the defendants were in possession at the date of the commencement of the action, the burden was on the plaintiffs to show a better title would not alter the situation, for, under the hypothesis of the instruction, the plaintiffs had successfully borne that burden.

The following instructions, being defendants' number 6 and number 7, were given against objection: No. 6. "I instruct you that unless you find from a preponderance of the evidence that during the whole of any period of 10 consecutive years during which it is asserted by plaintiffs that their possession and/or that of their predecessors of the land in dispute was ripening into title by adverse pos-

session, their possession of said land was exclusive, you must find for the defendants even though you find that plaintiffs have established every other element of adverse possession." No. 7. "I instruct you that if you find from the evidence that during any portion of any period of 10 consecutive years during which plaintiffs assert that the possession of Kala and Kaui and/or their successors in interest was ripening into title by adverse possession, Rose Hao also occupied said land, you must find for the defendants, unless you further find by the preponderance of the evidence that said Rose Hao was occupying said land by permission, express or implied, of Kala and Kaui and/or their successors in interest."

The only possible reason for giving the first of these on the subject of the exclusiveness of the possession was that there was some evidence tending to show that Rose had lived on the land together with Kala and Kaui; and its theory evidently was that if Rose was in possession at the same time as Kala and Kaui the possession of Kala and Kaui could not possibly have been adverse within the meaning of the law. In this there was error. If in fact Kala and Kaui and Rose, all three of them, together possessed the land for more than the statutory period, all under a claim of title and with the other elements of an adverse holding and with the common design of wresting the title away from the true owner, their possession would create title in themselves,—in Kala and Kaui on the one hand just as clearly as in Rose on the other hand. There is nothing in the law to prevent two or more jointly obtaining title by adverse possession provided only there is no element of hostility in the holding of each toward the other or others. Defendants' instruction number 6 was not in conformity with this view of the law.

Both of these instructions, numbered 6 and 7 respectively, were also obviously based upon the theory that if

Rose was not holding by permission of Kala and Kaui but was holding jointly with them, in friendship towards them, with the common purpose of creating for themselves title by adverse possession in hostility to that of the true owner, the resulting estate in the three disseizors was a joint tenancy and not a tenancy in common and that since Rose was the last survivor of the three she became the sole owner of the title so acquired by adverse possession. In this court, as in the lower court, it is contended that such is the law of joint disseizin.

It is true that at the early common law of England an adverse holding by two or more, if continued for the statutory period, created a joint estate in the occupants with a resulting right of survivorship to the last survivor; and this court so held in *Kauhikoa* v. *Hobron,* 5 Haw. 491, 493 (October 1885), quoting from Littleton, Sec. 278, "If two or three, etc., disseise another of any lands or tenements to their own use, then the disseisors are joint tenants," and citing in addition *Putney* v. *Dresser,* 2 Met. 583, and *Allen* v. *Holton,* 20 Pick. 458. At the common law estates held by two or more, whether created by deed or by will or by disseizin, were deemed to be joint estates and not tenancies in common, unless it was expressly stated in the document or in the agreement of the parties that the contrary was intended and desired. The rule originated in the feudal system then prevailing in England and was intended to protect the military services due to the overlord. On the contrary, in the United States, under wholly different conditions, joint estates have never been favored as against tenancies in common and the latter have always been preferred. The American rule has been and is to declare an estate to be in common in the absence of forceful reasons to the contrary apparent in the deed or will or agreement. In many American jurisdictions statutes have been passed making this construction obligatory. "At the

early common law the general rule was that a transfer of an estate to two or more grantees, in the absence of an expressed intention to sever the interests, was deemed to create a joint tenancy rather than a tenancy in common. The law favored joint tenancy rather than tenancy in common because the latter estate tended to split up feudal services and hence to disorganize the feudal military system." Ann. Cas., 1917B, 58.

"Joint tenancy, with its jus accrescendi, or right of survivorship, is an estate of distinctly feudal origin and founded on feudal military expediency. * * * This being so the tendency in America has from the first been away from that estate and in favor of tenancy in common. * * * The legislatures of practically every state have advanced what was already a tendency of judicial construction, by statutory enactments more or less radically changing the common law as to the construction of co-tenancies. * * * Some of those statutes abolish joint tenancies entirely; some of them virtually abolish them by abolishing the jus accrescendi, in whole, or with certain exceptions; and some allow joint tenancies only where the instrument creating an estate expressly declares it to be such, by providing that in the absence of an express declaration of intention to create a joint tenancy an estate to two or more is to be deemed a tenancy in common, thus changing the common law quoad hoc." *Ib.* 66.

*Awa* v. *Horner,* 5 Haw. 543 (January 1886), was an action of ejectment in which the question arose whether the two patentees named in a certain royal patent were tenants in common or were joint tenants, the patent being silent on the subject. This court said: "It is somewhat remarkable that a question so important as this, involving titles to land all over the Kingdom, should not have been earlier presented to the court for adjudication. Says Washburn, in Real Property, p. 407: 'By the com-

mon law in England, where an estate is conveyed to two or more persons, without indicating how the same is to be held, it will be held to be in joint tenancy, upon the feudal idea that the services due to the lord should be kept entire.' But the common law is not in force in this Kingdom *proprio vigore*. It has frequently been so held by this court. That we are, however, free to adopt the reasonings and principles of the common law is undoubted. This authority is expressly conferred upon the court by sections 14 and 824 of the Civil Code. To do this we must be satisfied that the principle to be adopted is 'founded in justice, and not in conflict with the laws and customs of this Kingdom.' Upon careful consideration, we think it would be unwise to adopt the principle contended for by defendants. Mr. Washburn says, *ib*. 408: 'The policy of the American law is opposed to the notion of survivorship, and therefore regards such estates as tenancies in common. In many of the States the rule of survivorship is abolished by statute, except in case of joint trustees, while in others all estates to two or more persons are taken to be tenancies in common, unless expressly declared to be joint tenancies by the deed or instrument creating them, with a similar exception of estates to joint trustees.' In this Kingdom, as in the States, there are no feudal tenures existing, requiring services from the landholder to the lord paramount. The reason, therefore, for the rule has no existence here. The most natural and obvious view would be that where land is conveyed to two or more persons, it was their expectation that it should descend to the heirs of each of them and not to the survivor of them. We believe it to be true also that such conveyances have been generally understood and treated in this Kingdom as creating estates of tenancies in common, and we ought to hold for the protection and peace of land titles that such is the law of the country."

In 1886 this court was at liberty, under a statute, either to adopt or to reject the principles and the reasoning of the common law, as to it might seem just and proper. The decision in *Awa* v. *Horner* was a distinct repudiation of the reasoning and the principles of the common law on the subject of the construction of tenancies by two or more when there was nothing in the language used to clearly show what was intended by the parties. It is true that that decision was rendered with reference to an estate created by express grant; but the same reasoning would apply to an estate created by disseizin. It is also true that recognition of titles created by adverse possession was upon the theory of a lost grant or deed,—in the construction of which latter joint tenancies were favored as against tenancies in common for the military reasons already adverted to.

In *Allen* v. *Holton,* 20 Pick. 458, cited in support of the view expressed in *Kauhikoa* v. *Hobron,* there was an abandonment of the land for twenty-one years by one of the joint disseizors. The case thereby loses some at least of its force when cited in support of the rule. *Putney* v. *Dresser* was decided in 1841 and *Allen* v. *Holton* in 1838, and yet several years later, in 1849, the Massachusetts court apparently was not entirely satisfied with the ruling in *Putney* v. *Dresser,* for it said: "Whether, in this state, joint disseizors, entering without title, or color of title, are joint tenants or tenants in common,—*quaere.*" *Fowler* v. *Thayer,* 4 Cush. 111, 113. It is impossible for us to reconcile *Kauhikoa* v. *Hobron* with *Awa* v. *Horner* and, using the language of Mr. Chief Justice Taft in *Adkins* v. *Hospital,* 261 U. S. 564, it seems to us that the earlier of the two cases, to-wit, *Kauhikoa* v. *Hobron,* "was thus overruled *sub silentio.*"

Section 1, R. L. 1925, first passed in the Judiciary Act of 1892, provides that, "The common law of England, as

ascertained by English and American decisions, is declared to be the common law of the Territory of Hawaii in all cases, except as otherwise expressly provided by the Constitution or laws of the United States, or by the laws of the Territory, or fixed by Hawaiian judicial precedent, or established by Hawaiian usage." In the consideration of this section this court has expressly held, in *Rooke* v. *Queen's Hospital,* 12 Haw. 375, 380, that "since the enactment of that statute the previous rejection of certain material parts of a system" (of the English common law) "has been regarded as amounting to a rejection of other parts." The rejection by this court in *Awa* v. *Horner* of the English system with reference to estates created by deed and by will—material parts of that system—amounts to and justifies and requires the rejection of the other part of the same system relating to the construction of tenancies created by two or more disseizors. It would be entirely inconsistent and unreasonable to hold that an estate created by two or more holding together adversely to the true owner is, in the absence of any agreement to the contrary, a joint estate, with its consequent right of survivorship, and at the same time to hold that an estate created by a will or deed to two or more is, in the absence of expressions to the contrary, a tenancy in common and not a joint tenancy. The same reasons which moved the court in *Awa* v. *Horner* to reject the English doctrine in its application to deeds and wills lead with equal force to the rejection of the other parts of the same system, to-wit, in the construction of estates acquired by two or more by their joint disseizin of the true owner.

In 1903, secton 3190, R. L. 1925, was enacted, providing that: "All grants, conveyances and devises of land, or of any interest therein, made to two or more persons, shall be construed to create estates in common and not in joint-tenancy or by entirety, unless it shall manifestly ap-

pear from the tenor of the instrument that it was intended to create an estate in joint-tenancy or by entirety, provided, however, that the foregoing provision shall not apply to grants, conveyances or devises to executors or trustees." This was an express declaration by the legislature of its preference for the American rule and emphasizes the correctness of the view that the rule of the common law is not in harmony with conditions in Hawaii and is not in force in this jurisdiction.

A correct instruction to the jury would have been, in effect, that if Kala, Kaui and Rose were joint disseizors for the full term of the statutory period, they thereby, in the absence of any understanding to the contrary, acquired undivided interests as tenants in common, descendible to their heirs and devisees, and assignable, and that under those circumstances the plaintiffs were entitled to recover an undivided two-thirds interest in the land. Such an instruction, when given, should be guarded with the qualification that if Rose held merely under or by the permission of Kala and Kaui she acquired no title by her possession; and that possession by her without claim of ownership would not be hostile to the true owner within the meaning of the law of adverse possession.

The verdict is set aside and a new trial is granted.

*N. D. Godbold (E. H. Magoon* and *Heen, Godbold & Kelley* on the briefs) for plaintiffs.

*I. M. Stainback (Huber, Kemp & Stainback* and *A. J. Buscheck* on the brief) for defendants.